A11A0510. BRYANT v. COX ENTERPRISES, INC. et al.
(715 SE2d 458)

DILLARD, Judge.

This case is the culmination of years of litigation during which Richard Jewell and, since his death, the executor of Jewell's estate (collectively, "Jewell"), have sought retribution for the injury to Jewell's reputation following his identification in the media as a suspect in the Centennial Olympic Park bombing during the 1996 Olympic Games in Atlanta. Jewell sued Cox Enterprises, Inc. d/b/a The Atlanta Journal Constitution ("AJC")[1] and various AJC reporters[2] (collectively, "Media Defendants") for statements made in several articles in which the Media Defendants reported, inter alia, that investigators believed Jewell planted the bomb in Centennial Olympic Park and then placed a 911 call to law enforcement. In *Atlanta Journal-Constitution v. Jewell* ("*Jewell I*"),[3] this Court affirmed the trial court's ruling that Jewell was a limited-purpose public figure in the context of this case, and further set forth a balancing test to aid the trial court in deciding whether to force the Media Defendants to

---

[17] 957 SW2d 815 (Tenn. 1997).
[18] See generally *Sarvis*, supra.
[1] The AJC defendants include The Atlanta Journal and The Atlanta Journal Constitution.
[2] The reporters relevant to the articles under consideration in this appeal include Kathy Scruggs (now deceased), Ron Martz, and Dave Kindred.
[3] 251 Ga. App. 808 (555 SE2d 175) (2002).

reveal the identities of the confidential sources from whom they gleaned the information reported in the subject articles.[4] Upon remand, the trial court concluded that Jewell could not satisfy the requirements set forth in *Jewell I* and, consequently, denied Jewell's motion to compel. In subsequent orders, the trial court granted summary judgment in favor of the Media Defendants on all of Jewell's claims. It is from these orders that Jewell now appeals. For the reasons noted infra, we affirm the trial court's orders.

## I. Background

The underlying facts of this case are not in dispute. The Centennial Olympic Park bombing occurred in the early morning hours of July 27, 1996. Jewell, who had been working in the park as a private security guard, identified an unattended knapsack under a park bench and immediately alerted an officer from the Georgia Bureau of Investigation ("GBI") to its existence. The discovery of the knapsack was the direct result of Jewell's remarkable astuteness, as illustrated by frequent and detailed surveys of his patrolling area, as well as his keen awareness—despite an ongoing concert and a significant crowd—of the relationship between the multitude of people around him and their various belongings.

Shortly after Jewell and the GBI officer attempted unsuccessfully to identify the owner of the knapsack, the GBI officer reported it to his command post as a suspicious package and requested the dispatch of a bomb-inspection team. Almost immediately thereafter, an anonymous 911 call was made to the Atlanta Police Department, notifying it of the bomb in the park and warning ominously, "you have 30 minutes." The call was placed from a pay phone located several blocks from the park.

Unaware of the 911 call, the bomb squad responded to the GBI officer's request to inspect the knapsack and determined that it contained an explosive. Jewell aided other law-enforcement officials in evacuating individuals from the area surrounding the bomb prior to its detonation, which occurred approximately 20 minutes after the 911 call was made. Tragically, the bomb took the lives of two victims—one killed directly from the blast and a second who died of a heart attack while running from the scene—and wounded over 100 others. It is widely acknowledged, however, that the acumen, quick-thinking, and bravery exhibited by Richard Jewell during that perilous window of time unquestionably saved the lives of countless individuals.

In the days following the bombing, Jewell's employer, AT&T, scheduled him to participate in numerous television interviews,

---

[4] *Id.* at 816-19 (3).

232

which he reluctantly agreed to do. At this time, Jewell was being universally hailed by the media as a hero.

On July 30, however, the tone of the media's coverage of Jewell changed dramatically after the AJC published a breaking story entitled *"FBI suspects 'hero' guard may have planted bomb,"* in which it identified Jewell as "the focus of the federal investigation[.]" The article claimed that Jewell "fit[ ] the profile of the lone bomber," accused him of "approach[ing] newspapers, including [t]he [AJC], seeking publicity for his actions," and reported that "[i]nvestigators [were] checking to see if his voice matche[d] that of a 911 caller who phoned in a warning of the park bomb." The AJC did not attribute any of the assertions contained in the article to an official source or otherwise identify the origin of this information.

CNN then reported the contents of the AJC article, and Jewell instantly became the subject of intense world-wide media scrutiny. For the next 88 days, Jewell and his mother—with whom he was living and caring for while she recovered from surgery—were constantly surveilled by a swarm of reporters that remained camped outside of their apartment.

In the interim, the Media Defendants published additional articles which form the basis of the instant appeal. Specifically, in a July 31 article, the AJC reported that "[i]nvestigators . . . believe [Jewell] placed the 911 call himself." On August 1, the AJC referred to Jewell as the man "who investigators believe may have planted the pipe bomb. . . ." And, on August 4, the AJC published an article in which it repeated that, "[i]nvestigators have said they believe Jewell . . . planted the bomb and phoned in a warning to 911." Again, none of the articles indicated the sources of the reported information. Additionally, writer Dave Kindred published a column on August 1, entitled *"A long wait in the shadows after his moment in the sun"* (the "Kindred column"), in which Kindred described Jewell as he waited outside while federal agents searched his apartment. Kindred then drew comparisons between Jewell and the notorious Wayne Williams, a convicted child serial killer (who was also from the Atlanta area).

On October 26, 1996, the United States Department of Justice took the unusual step of formally announcing that Jewell was no longer a suspect in the investigation. Eric Robert Rudolph subsequently admitted to planting the Centennial Olympic Park bomb, and he is currently serving a life sentence for that and several other bombings.

## II. Procedural History

In January 1997, Jewell filed a complaint for libel against the Media Defendants, alleging that he had been defamed in various

publications. Years of extremely contentious discovery ensued, requiring the trial court to oversee and resolve a seemingly endless number of disputes between the parties. Jewell repeatedly insisted that he was entitled to know the identities of the sources who allegedly provided the Media Defendants with the information published in the early days of the investigation, and the Media Defendants steadfastly refused to produce the identities of their sources, claiming that not only the identities, but also any information possibly leading to those identities, were privileged. The trial court ultimately rejected the Media Defendants' position that the information was privileged, and granted Jewell's motion to compel. The trial court also deemed Jewell a limited-purpose public figure in the context of its defamation analysis, thus requiring him to prove, prior to recovery, that the statements at issue were published with actual malice. When the Media Defendants repeatedly defied the trial court's order by refusing to reveal the source identities, the trial court held two AJC reporters, Scruggs and Martz, in contempt and ordered them incarcerated indefinitely until they complied with its mandate.

In *Jewell I*, we affirmed the trial court's holding that Jewell was a limited-purpose public figure.[5] We nonetheless introduced a balancing test that required the trial court to weigh Jewell's specific need for the identities of the Media Defendants' confidential sources against the Media Defendants' interest in protecting the privacy of those sources, but only after the court assessed the potential viability of Jewell's claims as a threshold to ordering such disclosure.[6] After the case was remanded, the trial court denied Jewell's motion to compel, concluding that Jewell could not meet the showing of need set forth in *Jewell I* because the challenged statements were either substantially true and/or the identities of the confidential sources were unnecessary to establish whether the statements were defamatory. In a subsequent order, the trial court granted summary judgment to the Media Defendants on all but one of Jewell's claims, reasoning that the published statements were not actionable because they lacked the requisite degree of falsity and/or there was insufficient evidence to conclude that they were made maliciously. Sometime thereafter, at the invitation of Jewell and for the purposes of judicial economy, the trial court granted the Media Defendants

---

[5] *See generally* 251 Ga. App. at 808. Jewell argues on appeal that it was error to classify him as a limited-purpose public figure. But this holding represents the law of the case, to which we are bound. *See* OCGA § 9-11-60 (h) ("[A]ny ruling by the Supreme Court or the Court of Appeals in a case shall be binding in all subsequent proceedings in that case in the lower court and in the Supreme Court or the Court of Appeals as the case may be."); *Bruce v. Garges*, 259 Ga. 268, 270 (2) (379 SE2d 783) (1989).

[6] *Jewell I*, 251 Ga. App. at 811-14 (2).

234

summary judgment on Jewell's last claim, reasoning that it was barred by the incremental-harm doctrine.

It is from these orders that Jewell now appeals. Jewell has limited this appeal to the above-quoted statements contained in the July 31, August 1, and August 4 articles, as well as those made in the Kindred column.[7] Specifically, Jewell argues that the trial court erred in denying the motion to compel the disclosure of the Media Defendants' confidential sources and in granting summary judgment to the Media Defendants. For the reasons noted infra, we affirm.

## III. Applicable Law

Under Georgia law, any "false and malicious defamation of another in any newspaper, . . . tending to injure the reputation of the person and expose him to public hatred, contempt, or ridicule" constitutes libel.[8] To succeed in a libel action, a plaintiff must prove that the defendant "published a defamatory statement about the plaintiff, the defamatory statement was false, the defendant was at fault in publishing it, and the plaintiff suffered actual injury from the statement[ ]."[9]

Critical to any defamation analysis is the issue of falsity, and the burden to prove that a published statement is false rests squarely with the plaintiff.[10] To this end, "defamation law overlooks minor inaccuracies and concentrates upon substantial truth."[11] In other words, "[a] statement is not considered false unless it would have a different effect on the mind of the viewer from that which the pleaded truth would have produced."[12]

Moreover, as a general rule, statements of pure opinion are not capable of being proven false and cannot form the basis of a defamation claim.[13] That said, a defendant is not spared from liability simply by couching an alleged defamatory falsehood in the context of

---

[7] See supra, Division I.

[8] OCGA § 51-5-2 (a); see OCGA § 51-5-1 (a).

[9] Mathis v. Cannon, 276 Ga. 16, 21 (2) (573 SE2d 376) (2002) (footnotes omitted).

[10] Philadelphia Newspapers, Inc. v. Hepps, 475 U. S. 767, 776 (II) (106 SC 1558, 89 LE2d 783) (1986) (noting that, when a plaintiff seeks damages against a media defendant for speech of public concern, the United States Constitution requires "that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages"); Swindall v. Cox Enters., Inc., 253 Ga. App. 235, 236 (558 SE2d 788) (2002) (confirming that "the plaintiff has the burden of proving the statement's falsity" (footnote omitted)).

[11] Austin v. PMG Acquisition, LLC, 278 Ga. App. 539, 541 (629 SE2d 417) (2006) (citation and punctuation omitted).

[12] Id. (citation and punctuation omitted); see also Jaillett v. Ga. Television Co., 238 Ga. App. 885, 888 (520 SE2d 721) (1999).

[13] See, e.g., Chaney v. Harrison & Lynam, LLC, 308 Ga. App. 808, 811 (1) (a) (708 SE2d 672) (2011) ("[A] defamation action will lie only for a statement of fact . . . because a statement that reflects an opinion or subjective assessment, as to which reasonable minds could differ,

an opinion, be it the defendant's own opinion or that of a third-party.[14] Rather, such a statement "can constitute actionable defamation if the opinion can reasonably be interpreted, according to the context of the entire writing in which the opinion appears, to state or imply defamatory facts about the plaintiff that are capable of being prove[n] false."[15] As illustrated by the Supreme Court of the United States in *Milkovich v. Lorain Journal Co.*,[16] "the statement, 'I think Jones lied,' may be provable as false on two levels[;] [f]irst, that the speaker really did not think Jones had lied but said it anyway, and second that Jones really had not lied."[17] When examining whether a statement is actionable under the second level in the *Milkovich* analysis, "[t]he pivotal questions are whether [the challenged statement] can reasonably be interpreted as stating or implying defamatory facts about plaintiff and, if so, whether the defamatory assertions are capable of being prove[n] false."[18] If the meaning of a publication is unambiguous so as to bear only one reasonable interpretation, the determination as to whether it is defamatory is for the court.[19]

And here, because Jewell has been deemed a limited-purpose public figure in this action,[20] his burden does not end with proving that the challenged statements were false and defamatory. In an

---

cannot be proved false." (citations and punctuation omitted)); *Bergen v. Martindale-Hubbell, Inc.*, 176 Ga. App. 745, 746-47 (3) (337 SE2d 770) (1985) ("The expression of opinion on matters with respect to which reasonable men might entertain differing opinions is not libelous." (citation and punctuation omitted)).

[14] *See Gast v. Brittain*, 277 Ga. 340, 341 (589 SE2d 63) (2003) ("There is . . . no wholesale defamation exception for anything that might be labeled opinion." (punctuation and footnote omitted)); *Baskin v. Rogers*, 229 Ga. App. 250, 252 (2) (493 SE2d 728) (1997) ("Every repetition of a slander originated by a third person is a wilful publication of it, rendering the person so repeating it liable to an action, and it is no defense that the speaker did not originate the slander, but heard it from another, even though he in good faith believed it to be true." (citation and punctuation omitted)); *Ivester v. Coe*, 33 Ga. App. 620 (6) (127 SE 790) (1925) ("Talebearers are as bad as talemakers." (punctuation omitted)).

[15] *Gast*, 277 Ga. at 341; *see Brewer v. Rogers*, 211 Ga. App. 343, 346 (2) (a) (439 SE2d 77) (1993) (recognizing that "[a] defamatory statement may be made in indirect terms or by insinuation" when considering the publication as a whole, and "[t]he question is what construction the average [reader] would place upon the [publication]" (citation and punctuation omitted)).

[16] 497 U. S. 1 (110 SC 2695, 111 LE2d 1) (1990).

[17] *Id.* at 20, n.7.

[18] *Eidson v. Berry*, 202 Ga. App. 587, 587 (415 SE2d 16) (1992); *see Bellemeade, LLC v. Stoker*, 280 Ga. 635, 638 (631 SE2d 693) (2006) ("[T]he dispositive question . . . [is] whether a reasonable factfinder could conclude that the statements claimed to be opinion implied an assertion of defamatory facts and, if so, whether it was sufficiently factual to be susceptible of being proved true or false." (citation and punctuation omitted)); *Jaillett*, 238 Ga. App. at 890 ("[A] statement of opinion is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." (citation, punctuation and emphasis omitted)).

[19] *See, e.g.*, *Lucas v. Cranshaw*, 289 Ga. App. 510, 513 (1) (659 SE2d 612) (2008).

[20] *Jewell I*, 251 Ga. App. at 816 (3).

attempt to balance a public figure's need for a remedy against society's need to protect the freedoms of speech and of the press enshrined in our Constitution, the law—as interpreted by the Supreme Court of the United States—requires that Jewell prove by clear and convincing evidence that the Media Defendants also published the challenged statements with actual malice.[21] "Actual malice" in this constitutional context "is not merely spite or ill will, or even outright hatred; it must constitute actual knowledge that a statement is false or a reckless disregard as to its truth or falsity."[22] The question of whether the record evidence is sufficient to support a finding of malice is a question of law.[23]

Jewell maintains that, in order to meet this hefty burden, he is entitled to know the identities of the confidential law-enforcement sources who purportedly supplied the Media Defendants with the information upon which they maintain they were fairly reporting. But in accordance with the balancing test set forth in *Jewell I*, prior to compelling the Media Defendants to reveal the identities of their confidential sources, Jewell must

> specifically identify each and every purported statement he asserts was libelous, [and the trial court must] determine whether [Jewell] can prove the statements were untrue,

---

[21] *See id.*, 251 Ga. App. at 816-20 (3) ("[I]n order for a 'public figure' to recover in a suit for defamation, there must be proof by clear and convincing evidence of actual malice on the part of the defendant." (citation omitted)); *see also Milkovich*, 497 U. S. at 17 ("[I]n cases raising First Amendment issues[,] an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." (citation and punctuation omitted)); *Mathis*, 276 Ga. at 21 (3) (burden of proving actual malice falls upon the plaintiff); *Brewer*, 211 Ga. App. at 348 (2) (c) ("Neither lies nor false communications serve the ends of the First Amendment, and no one suggests their desirability or further proliferation. But to insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones." (citation and punctuation omitted)). *See generally Gertz v. Robert Welch, Inc.*, 418 U. S. 323, 339-48 (III) (94 SC 2997, 41 LE2d 789) (1974); *New York Times Co. v. Sullivan*, 376 U. S. 254, 279-80 (II) (84 SC 710, 11 LE2d 686) (1964).

[22] *Atlanta Humane Soc'y v. Mills*, 274 Ga. App. 159, 165 (3) (618 SE2d 18) (2005) (citation omitted); *see Mathis*, 276 Ga. at 25 (3); *Davis v. Shavers*, 225 Ga. App. 497, 500-01 (3) (484 SE2d 243) (1997) ("Actual or constitutional malice is different from common law malice because knowledge of falsity or reckless disregard of the truth may not be presumed nor derived solely from the language of the publication itself[, but] requires clear and convincing proof that a defendant was aware of the likelihood he was circulating false information." (citation and punctuation omitted)); *Miller v. Woods*, 180 Ga. App. 486, 488 (349 SE2d 505) (1986) ("[I]t is not sufficient to measure reckless disregard by what a reasonably prudent man would have done under similar circumstances nor whether a reasonably prudent man would have conducted further investigation[; rather,] [t]he evidence must show in a clear and convincing manner that [a defendant] in fact entertained serious doubts as to the truth of his statements[.]" (citation omitted)).

[23] *Milkovich*, 497 U. S. at 17.

taking into account all the other available evidentiary sources, including [his] own admissions, and determine whether the statements can be proven false through the use of other evidence, thus eliminating [his] necessity for the requested discovery.[24]

If the trial court determines that a challenged statement is substantially true or incapable of being proven false, or if Jewell can prove his specific allegation by other means, the balancing test favors nondisclosure.[25] But if the trial court deems a specific allegation of libel legally viable (or if it cannot determine its viability), and the identities of the sources are relevant and material and/or are the only available avenue to obtain other admissible evidence, the balancing test favors disclosure of the source identities.[26]

Obviously, given this framework, the analysis of whether Jewell is entitled to compel the identities of the confidential sources of the challenged statements overlaps to a great degree with the inquiry into whether the trial court properly granted summary judgment to the Media Defendants on Jewell's claims as to those statements. To explore these interrelated issues, we will divide the challenged statements into three general categories: (A) statements that investigators believed Jewell planted the bomb; (B) statements that investigators believed Jewell placed the 911 call; and (C) statements in the Kindred column drawing comparisons between Jewell and Wayne Williams. We will address each of these categories of statements in turn.

(A) *August 1 and August 4 Statements that Investigators Believed Jewell Planted the Bomb.* On August 1, in an article entitled *"Search Goes On,"* the Media Defendants identified Jewell as the man "who investigators believe may have planted the pipe bomb. . . ."[27] Similarly, in an August 4 article entitled *"FBI takes hair, voice samples from Olympic security guard,"* the Media Defendants reported that "[i]nvestigators have said they believe Jewell . . . planted the bomb[.]"[28] Jewell specifically argues that, despite being couched in the opinion of law-enforcement officers, those statements amounted to a "charge" by the Media Defendants that Jewell planted the bomb. He further asserts that, because it has now been definitively established that he did not plant the bomb, the statements were false under the second-

---

[24] *Jewell I*, 251 Ga. App. at 813 (2).

[25] *Id.*

[26] *Id.*

[27] The text of the August 1 article, as originally published, is reproduced and attached to this opinion as Appendix A.

[28] The text of the August 4 article, as originally published, is reproduced and attached to this opinion as Appendix B.

level of falsity referenced in *Milkovich*.

The fundamental flaw in Jewell's argument, however, is that these statements cannot be considered in isolation to determine whether they are true or false.[29] Rather, we must construe each statement in the context of the entire writing to assess the construction placed upon it by the average reader.[30]

And viewed in its entirety, the August 1 article identified Jewell as the man "who investigators believe may have planted the pipe bomb" in the context of describing how federal investigators spent the afternoon searching Jewell's apartment and seizing various items, including his truck and what appeared to be a rug. But the article also referenced the fact that Jewell had not been charged with a crime and reported that one unnamed Washington official indicated that the investigation was "moving away" from Jewell. The article also quoted a neighbor of Jewell's who proclaimed that any allegation that Jewell planted the bomb was "[b]ull!," and who also went on to praise Jewell as "[a] hero . . . who [was] willing to sacrifice his life for other people."

Similarly, the August 4 article explained that "[i]nvestigators have said they believe Jewell . . . planted the bomb" while reporting that FBI agents were attempting to collect hair, voice, and fingerprint samples from Jewell. The article nonetheless quoted Jewell's attorney as describing the FBI's tactics as "overkill" with "political" motivations, and noted that an FBI spokesman maintained that the FBI "ha[d] other suspects in the case." Finally, the article reported that "[t]he FBI in Atlanta . . . would not comment on persistent news reports out of Washington that the voice on a 911 taped phone call doesn't match Jewell's[,]" and that an FBI spokesman claimed that the recorded voice was one of a white male with no apparent accent. The article then noted, importantly, that "Jewell has a Southern drawl."

Viewed in this manner, we cannot conclude that the statements contained within the August 1 and August 4 articles, construed in the context of the entirety of those articles and given their reasonable and natural meaning, amounted to an accusation by the Media Defendants that Jewell planted the bomb. Rather, a reasonable reader would have understood the information to be preliminary in

---

[29] We further question Jewell's hyper-technical reading of the second level of falsity as set forth in *Milkovich*. As noted by the dissent in that case, using the same example posited by the majority, "Jones cannot recover for defamation for the statement 'I think Jones lied about his age just now' by producing proof that he did not lie about his age because . . . he would have proved the wrong assertion false. The assertion Jones must prove false is that the speaker had, in fact, drawn the inference that Jones lied." *Milkovich*, 497 U. S. at 27 (I) n.4 (Brennan, J., dissenting).

[30] *Gast*, 277 Ga. at 341; *Brewer*, 211 Ga. App. at 346 (2) (a).

nature and published during the very early stages of an ongoing investigation. Moreover, both articles reported not only the suspicion of Jewell's involvement, but also evidence tending to belie that suspicion.[31] And finally, the record definitively establishes that at the time of the publications, investigators did, in fact, suspect that Jewell may have planted the bomb and were actively investigating that theory. As stated in the summary report written by the United States Department of Justice Office of Professional Responsibility ("OPR Report"),[32] "[b]y the end of [July] 29th, Mr. Jewell had emerged as the principal (though not the only) suspect in the CENTBOM investigation." Thus, because the articles in their entirety were substantially true at the time they were published—even though the investigators' suspicions were ultimately deemed unfounded—they cannot form the basis of a defamation action against the Media Defendants.[33] It follows, then, that the trial court did not err in denying Jewell's motion to compel the sources of those statements, nor did it err in granting summary judgment to the Media Defendants on Jewell's claims regarding same.

(B) *July 31 and August 4 Statements that Investigators Believed*

---

[31] *Compare Harcrow v. Struhar*, 236 Ga. App. 403, 404 (511 SE2d 545) (1999) (holding that defendant's disclaimer that "I'm not saying that [plaintiffs] are responsible for this atrocious act" was insufficient to overcome the plain import of the writing that amounted to an accusation that plaintiffs killed his cat); *Stokes v. CBS Inc.*, 25 FSupp.2d 992, 1003-05 (C) (1) (d) (D. Minn. 1998) (holding that a jury question existed as to whether media defendant acted with actual malice in publishing a report about plaintiff's possible involvement in the murder of her husband; although the report included a disclaimer that plaintiff denied committing the crime, it otherwise ignored possibly mitigating evidence and presented a "highly slanted perspective" of the crime investigation "[t]hrough the use of ambush tactics and distorting visual and editorial techniques").

[32] The report, entitled *Summary of the Investigation by the Office of Professional Responsibility Into the Circumstances Surrounding the Interview of Richard A. Jewell in the CENTBOM Case*, was the result of an investigation initiated on October 31, 1996 by the Department of Justice Office of Professional Responsibility at the direction of Attorney General Janet Reno to address concerns related to the FBI's interview of Jewell after he became a suspect. ("CENTBOM" was the moniker assigned by federal investigators to the Centennial Olympic Park bombing.) The report was compiled from information obtained by numerous federal agents and attorneys with knowledge relevant to the Jewell investigation and was submitted to Congress in July 1997. The trial court relied on certain statements in the report after admitting them into evidence under the necessity exception to the hearsay rule. Neither party has challenged the admission of that evidence.

[33] *See, e.g., Lucas*, 289 Ga. App. at 512-15 (1) (affirming the grant of summary judgment to newspaper defendants after concluding that a reasonable reader would not have interpreted the article in its entirety to have a false and defamatory meaning); *Blomberg v. Cox Enters., Inc.*, 228 Ga. App. 178, 179-81 (1) (491 SE2d 430) (1997) (recognizing that no liability exists for a substantially accurate, even incomplete, publication "[a]s long as facts are not misstated, distorted or arranged so as to convey a false and defamatory meaning" (citation and punctuation omitted)); *Constitution Publ'g Co. v. Andrews*, 50 Ga. App. 116 (177 SE 258) (1934) (reversing trial court's denial of defendant's general demurrer because the plain and unambiguous effect of the article, construed in its entirety, did not have a false and defamatory meaning).

*Jewell Placed the 911 Call.* On July 31, in an article entitled " *'Hero'
denies planting bomb*," the AJC reported that, "[i]nvestigators now
say . . . they believe [Jewell] placed the 911 call himself."[34] Likewise,
in the same August 4 article referenced in Division (III) (A), the AJC
stated that "[i]nvestigators have said they believe Jewell . . . phoned
in a warning to 911."

Again, we cannot agree with Jewell that the challenged state-
ments are actionable. Although the July 31 article repeats the
opinion of investigators who reportedly believed that Jewell may
have placed the 911 call, it includes within its text the factual
premise of that reported opinion. For example, the article sets forth
what some described as Jewell's fervent approach to his prior
law-enforcement duties; expressions of concern made by Jewell's
former employer; Jewell's prior arrest for impersonating a police
officer; and Jewell's reported ownership of a similar knapsack.[35]
Nothing in the article suggests to the reader any defamatory facts
other than those disclosed within its text which, in context, is
obviously a report on the very early stages of an intense and ongoing
investigation.[36] Moreover, an affidavit filed in support of the FBI's
application for a search warrant of Jewell's apartment illustrates
that the article accurately reported the basis for the FBI's initial
suspicion of Jewell. Finally, it is undisputed that the FBI attempted
to take voice samples from Jewell, supporting the notion that at least
some investigators suspected a possible connection between Jewell
and the 911 call.

By August 4, however, the mounting evidence suggested that
Jewell could not have placed the 911 call, and Scruggs, the co-author
of the August 4 article, later admitted in deposition testimony that
she questioned the possibility of Jewell's involvement in the call on
that date. Yet the article still repeated that "[i]nvestigators have said
they believe Jewell . . . phoned in a warning to 911." It is certainly

---

[34] The text of the July 31 article, as originally published, is reproduced and attached to
this opinion as Appendix C.

[35] While this evidence tends to explain why investigators initially suspected that Jewell
may have planted the bomb, the obvious significance of the 911 caller was his active knowledge
of and involvement in the bombing. We note that the article further provides that "Jewell fits
the profile of a lone bomber." Although the record supports the Media Defendants' assertion
as to investigators' reported belief of that fact, Jewell has presented evidence challenging the
methodology behind and/or the validity of any such profile.

[36] *See, e.g.*, *Jaillett*, 238 Ga. App. at 891 (defendant's statement in a television broadcast
that plaintiff had "ripp[ed] [her] off" was not actionable because the basis for her opinion was
included in the broadcast). *Compare Milkovich*, 497 U. S. at 6-23 (holding that a reasonable
factfinder could conclude that statements in defendant-reporter's column, including "Anyone
who attended the [wrestling] meet . . . knows in his heart that [plaintiff] lied at the hearing
after . . . having given his solemn oath to tell the truth" implied an assertion of defamatory
facts that were capable of being proven false).

possible to imagine a circumstance in which such a statement could be actionable, especially given the author's admission to subjective doubts as to the veracity of facts underlying a stated opinion. But here, the statement was printed in an article reporting that the FBI was attempting to collect forensic evidence, including voice samples, from Jewell. The article as a whole, and particularly the writer's phraseology (i.e., "investigators have said"), would lead a reasonable reader to conclude that the statement was explanatory in nature. And significantly, the article itself reflects the same doubt that Scruggs admitted to having. As set forth supra, the article noted that the FBI "would not comment on persistent news reports out of Washington that the voice on a 911 taped phone call doesn't match Jewell's[,]" and highlighted that, unlike the voice on the 911 call, Jewell had a Southern drawl. Again, when read in context and given its reasonable and natural meaning, we cannot say that the August 4 article was not substantially true.[37]

Because the July 31 article did not imply the existence of undisclosed defamatory facts underlying the reported opinion and because the August 4 article was not false, it follows, then, that the trial court did not err in denying Jewell's motion to compel the sources of those reported statements, nor did it err in granting summary judgment to the Media Defendants on Jewell's claims based upon same.[38]

(C) *Kindred Column.* On August 1, the AJC published a column authored by Dave Kindred entitled, *"A long wait in the shadows after his moment in the sun,"*[39] which described Jewell sitting in the shadows of the staircase leading to his apartment as the FBI executed a search warrant of his home. Kindred continued:

> Hero or fool, he sat on the steps and leaned to his right to make room for agents passing on the staircase. An agent might sit with him awhile, talking about whatever FBI agents talk about with men who are suspects in murderous bombings.

---

[37] *See, e.g., Lucas,* 289 Ga. App. at 512-15 (1); *Blomberg,* 228 Ga. App. at 179-81 (1); *Constitution Publ'g Co.,* 50 Ga. App. 116.

[38] Although the trial court's grant of summary judgment to the Media Defendants as to the August 4 article was based upon a different legal theory, namely the incremental-harm doctrine, we will affirm the judgment of a trial court if it is right for any reason. *See, e.g., Craig v. Bailey Bros. Realty, Inc.,* 304 Ga. App. 794, 795 (697 SE2d 888) (2010) ("[A] grant of summary judgment must be affirmed if right for any reason, whether stated or unstated. It is the grant itself that is to be reviewed for error, and not the analysis employed." (citation and punctuation omitted)).

[39] The text of the Kindred column, as originally published, is reproduced and attached to this opinion as Appendix D.

Once upon a terrible time, federal agents came to this town to deal with another suspect who lived with his mother. Like this one, that suspect was drawn to the blue lights and sirens of police work. Like this one, he became famous in the aftermath of murder.

His name was Wayne Williams.

This one is Richard Jewell.

The column then went on to acknowledge that "the body language" of one federal agent indicated that the agent was "not finding anything[,]" and that another agent was "on the cell phone every 10 minutes to Washington saying, 'We can't put a guy in jail with what we've got here.'" It also quoted a neighbor who called Jewell "a regular fella" and a good neighbor. Nonetheless, the column concluded:

Maybe the regular fella had nothing to do with the bomb; the FBI has often sat on a suspect and come up empty. But when the FBI sat on Wayne Williams in 1981, it gathered enough to convict him for two murders and to clear 20 more.

Ken Hawkins remembers. A free-lance photographer who covered Williams and now works this story, he said, "Did you see the FBI take those little vacuum cleaners into Jewell's apartment? It's exactly what they did with Wayne Williams. And, like this one, they were at Williams' place all day."

Richard Jewell sits in the shadows today.

Wayne Williams sits in prison forever.

Jewell, clearly troubled by any comparison to Williams (a convicted child serial killer), argues that the column was false and defamatory to the extent it implied any similarity between the two men. And while we do not agree with the Media Defendants that Jewell's position requires a "tortured reading" of the column or that his arguments are "illusory," we nonetheless conclude that the column is not actionable.

Our holding in this regard is supported by the legal principles discussed supra. To support a defamation action, a statement must be one of objective fact. Non-literal commentary that cannot reasonably be interpreted as stating actual facts about an individual is not

actionable.[40] The Kindred column falls into this category. Kindred's conjectural comparisons between Jewell and Williams "consist[ ] of the sort of loose, figurative language that no reasonable person would believe presented facts."[41] And Kindred did not suggest that he had access to or was otherwise premising his comparison on undisclosed facts beyond those available to the reader.[42] Indeed, Kindred expressly acknowledged within the column the scarcity of evidence upon which it would have been reasonable to make such a comparison. It follows, then, that the Kindred column cannot form the basis of a defamation action.[43]

---

[40] *Bollea v. World Championship Wrestling, Inc.*, 271 Ga. App. 555, 558 (1) (610 SE2d 92) (2005) ("[I]f the allegedly defamatory statement could not be reasonably understood as describing actual facts about the plaintiff or actual events in which he participated, the publication will not be libelous." (citation omitted)); *see also Old Dominion Branch No. 496 v. Austin*, 418 U. S. 264, 284 (IV) (94 SC 2770, 41 LE2d 745) (1974) ("Before the test of reckless or knowing falsity can be met, there must be a false statement of fact." (citation omitted)); *Gertz*, 418 U. S. at 339-40 (III).

[41] *Horsley v. Feldt*, 304 F3d 1125, 1132-33 (II) (A) (11th Cir. 2002) (granting defendant judgment as a matter of law because no reasonable listener would have taken the accusation of a conspiracy as a literal assertion that the plaintiff had legally conspired with the persons who murdered a doctor and thereby committed a criminal offense); *see Mathis*, 276 Ga. at 24 (3) (noting that no person would reasonably interpret defendant's "incoherent messages" posted on a message board which called plaintiff a "crook" and a "thief" "as stating actual facts about [plaintiff], but would interpret them as the late night rhetorical outbursts of an angry and frustrated person opposed to the" action taken by plaintiff's company); *Lucas*, 289 Ga. App. at 514 (1) ("[A] mere statement of opinion or rhetorical hyperbole that cannot form the basis of a defamation claim." (punctuation and footnote omitted)). *Cf. Hustler Magazine v. Falwell*, 485 U. S. 46, 52 (108 SC 876, 99 LE2d 41) (1988) ("Freedoms of expression require 'breathing space' . . . [which] is provided by a constitutional rule that allows public figures to recover for libel or defamation only when they can prove *both* that the statement was false and that the statement was made with the requisite level of culpability." (citations and punctuation omitted)); *Bollea*, 271 Ga. App. at 558 (1) ("It is not unusual to protect false statements of fact where, because of the context, they would have been understood as part of a satire or fiction." (citation and punctuation omitted)).

[42] *See Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U. S. 6, 14 (90 SC 1537, 26 LE2d 6) (1970) ("[E]ven the most careless reader must have perceived that the [language] was no more than rhetorical hyperbole, a vigorous epithet. . . ."); *Horsley*, 304 F3d at 1133 (II) (A) (finding it significant that defendant "did not imply that she had access to any facts, beyond those that were undisputed" to support her accusations); *Jaillett*, 238 Ga. App. at 890 ("The requirement that, to be actionable, a statement of opinion must imply an assertion of objective facts about the plaintiff unquestionably excludes from defamation liability not only statements of rhetorical hyperbole[,] but also statements clearly recognizable as pure opinion because their factual premises are revealed[;] [b]oth types of assertions have an identical impact on readers—neither reasonably appearing factual—and hence are protected equally under the principles espoused in *Milkovich*." (citation and punctuation omitted)). *Compare Milkovich*, 497 U. S. at 6-23 (holding actionable an article implying that plaintiff had committed perjury because the writer did not use "the sort of loose, figurative, or hyperbolic language which would negate the impression that the writer was seriously maintaining that petitioner committed the crime[.]").

[43] We recognize that several AJC copy editors expressed concern about the Kindred column and reported those concerns to the appropriate managers, who ultimately rejected

## IV. Conclusion

Richard Jewell is unquestionably a tragic figure. Here is a man whose valor and quick thinking catapulted him from obscurity to beloved national hero almost instantaneously, who then saw those universal accolades vanish in the blink of an eye. All of the sudden, Jewell was the mistaken villain, forced to endure unfathomable media and law-enforcement scrutiny, as well as rampant media speculation that he may have committed the very crime he had so bravely attempted to thwart. And while Jewell's good name was eventually cleared, he and his family suffered tremendously as a result of this ordeal. For that, we have the greatest sympathy.

Nevertheless, for all of the reasons noted supra, we conclude that the trial court did not err in denying Jewell's motion to compel or in granting the Media Defendants summary judgment on Jewell's claims.[44]

*Judgment affirmed. Smith, P. J., and Mikell, J., concur.*

## ON MOTION FOR RECONSIDERATION.

We analyzed Jewell's claim related to the August 1 statement—in which the Media Defendants identified Jewell as the man "who investigators believe may have planted the pipe bomb . . ."—using a xerox copy of the article contained within our record that had been published in the paper on that date. Jewell argues on motion for reconsideration that this particular claim was based on a different version of the August 1 article, the text of which was attached as an exhibit to his complaint.[45] In that version, the

---

them and authorized publication of the article. We reiterate that,

> [t]he choice of material to go into a newspaper . . . and treatment of public issues . . . —whether fair or unfair—constitute the exercise of editorial control and judgment. It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press as they have evolved to this time.

*Miami Herald Publ'g Co. v. Tornillo*, 418 U. S. 241, 258 (IV) (94 SC 2831, 41 LE2d 730) (1974). *See also Gertz*, 418 U. S. at 340 (III) ("Some degree of abuse is inseparable from the proper use of every thing; and in no instance is this more true than in that of the press." (citation and punctuation omitted)).

[44] We deny Jewell's motion to strike and motion for sanctions based upon the discourteous and disparaging remarks contained in the Media Defendants' brief and directed at Jewell's counsel. We will, however, take the opportunity to comment that the overwhelming twelve-box appellate record, which approaches 50,000 pages in length, consists of page after page of unnecessary argument and dispute by counsel for both parties. Counsels' mutual inability to treat each other with professional courtesy and respect did little to expedite the resolution of this case.

[45] The text of the alternate version of the August 1 article, as affixed to Jewell's complaint, is attached to this opinion as Appendix E.

challenged statement omitted the qualifying words "may have" and identified Jewell as the man "who investigators believe planted the bomb. . . ."

The variations between the two versions of the August 1 article do not change our analysis or the outcome of this case. The alternate version of the article, construed in context and given its reasonable and natural meaning, does not amount to an accusation by the Media Defendants that Jewell planted the bomb. Rather, a reasonable reader would have understood that version of the August 1 article to be a report on the information gathered during the very early stages of an ongoing investigation. And, as previously noted, the record supports the accuracy of the report at the time it was published.

*Motion for reconsideration denied.*

## APPENDIX A

CENTENNIAL PARK BOMBING
SEARCH GOES ON
In pursuit of answers, agents combed the belongings of the man earlier hailed as a hero.

By Kathy Scruggs
STAFF WRITER
August 1, 1996
The Atlanta Constitution

Richard Jewell's life was photographed, categorized and filed Wednesday by federal agents investigating the Centennial Olympic Park bombing.

They carried boxes out of the security guard's two-bedroom apartment on Buford Highway from early afternoon until dusk, hauled away his pickup truck and even carried out what appeared to be his rug, wrapped in plastic.

By 8 p.m., officers had driven away truckloads of potential evidence, including a stack of videotapes about 3 feet high. Most of the agents packed up their gear and left, but two remained with Jewell until late in the evening, and about a half-dozen DeKalb County officers stood guard.

The agents were seeking evidence that could link Jewell, 33, with the bombing that resulted in two deaths and injured 111 early Saturday.

According to sketchy public accounts, Jewell apparently pointed out a knapsack to police a few minutes after 12:45 a.m. At 12:58 a.m., phone logs show, a 911 call came in to police from a pay phone three blocks from the scene. The device exploded about 25 minutes later.

246

Investigators say the walk from the scene to the pay phone takes eight minutes.

FBI Special Agent David Tubbs said Jewell has not been charged and has been cooperative with authorities.

Among the things law enforcement officers would be looking for are traces of gunpowder, wires, a clock similar to the one used as a timer or any sales receipt or other evidence of such a clock, and piping.

Jewell, who investigators believe may have planted the pipe bomb so he could be a hero in the aftermath, sat on the steps of his apartment during much of the search.

FBI agents also searched a shed near a cabin overlooking the Chattahoochee River in northeastern Georgia. Local residents reported that Jewell had rented the cabin before moving to Atlanta in May.

The Associated Press quoted an unnamed Washington official as saying the investigation is moving away from Jewell, but Atlanta FBI spokeswoman Joyce Dean said it was "premature" to suggest interest in Jewell had lessened. Federal agents arrived at Jewell's apartment and began the search about 9:10 a.m. Agents with the FBI and Bureau of Alcohol, Tobacco and Firearms carried trunk-sized containers into Jewell's apartment in the Monaco Station complex.

Neighbors and reporters were escorted to another part of the complex by law enforcement officers.

Jewell is a former Habersham County sheriff's deputy. He became a suspect in the bombing after the president of Piedmont College, which is in Habersham County, saw him interviewed on television and tipped investigators to his concerns.

Some who know him do not believe Jewell is capable of terrorism.

Neighbor Leonard Shinew said Jewell was a "very nice and cooperative fellow."

When asked whether he thinks Jewell could have committed the bombing, the man said very sharply, "Bull!"

When the security guard said he was not a hero even though he had been proclaimed one in the media, Shinew said he told Jewell, "A hero is an individual who is willing to sacrifice his life for other people." That's what Shinew thinks Jewell did.

In addition to the investigation, federal officials have responded to the bombing by significantly beefing up the number of security personnel in Atlanta.

Besides the 400 Georgia National Guard members and state law enforcement personnel, they have added 900 federal officers and about 300 federal employees.

"A lot of this was designed to enable us to double the number of

(security) people at Centennial Olympic Park," said Justice Department spokeswoman Carol Florman.

Staff writers Ron Martz, Bernadine Waller and Kent E. Walker contributed to this story.

## *APPENDIX B*

FBI takes hair, voice samples from Olympic security guard

By Kathy Scruggs
and Scott Marshall
STAFF WRITERS
August 4, 1996
The Atlanta Constitution

FBI agents, armed with a subpoena and a court order, collected Richard Jewell's hair and voice samples and fingerprints Saturday, a tactic his attorney said was "overkill."

G. Watson Bryant Jr. said agents are trying to "railroad his client" into a conviction in the Centennial Olympic Park bombing, which resulted in the deaths of two people and injured 111.

Investigators have said they believe Jewell, a security guard in the park who was originally credited with finding the bomb, planted the bomb and phoned in a warning to 911.

"If they do their jobs, there won't be any arrest," Bryant said. "But I think if they want to grandstand for the Olympics . . . then I think it's political. I think they've got to have somebody's ass for this, and it's his ass they're after."

They also wanted more detailed fingerprints and a voice sample "so they can somehow say it's a match" to the 911 call, Bryant said. "We don't even understand what hair has to do with anything. It seems to me what they want, they've already got. To me it's complete overkill. But we've got to get them off our backs."

Bryant said that Jewell's fingerprints were already on file from the police academy and security guard job and that they had tapes of his voice.

In the meantime, the FBI crime lab technicians in Washington are still poring over mountains of material collected from the bombing site and Jewell's home.

"If you're relying on forensic evidence, it can take a long time," said Special Agent Joyce Dean, FBI spokesman in Atlanta. FBI spokesmen have said repeatedly that they have other suspects in the case.

Dean declined to offer any timetable for when the investigation

would be complete. The pipe bomb exploded during a concert in the park July 27, resulting in the deaths of two and injuring 111.

The FBI in Atlanta also would not comment on persistent news reports out of Washington that the voice on a 911 taped phone call doesn't match Jewell's. But FBI spokesman David Tubbs has said that the voice is that of a white male with no apparent accent. Jewell has a Southern drawl.

Jewell remained sequestered in his Buford Highway apartment Saturday, visited only by FBI agents and Bryant.

At least two FBI agents and DeKalb County police had remained in Jewell's parking lot all day Saturday, even walking the property with umbrellas in a rainstorm, watching his residence as they apparently switched shifts and sometimes stood in a nearby mailbox shed.

The owner of both complexes, Tempo Real Estate, evicted reporters from Jewell's complex Thursday and also told reporters to leave the nearby complex and to stay within a 10-foot stretch of public right of way beside Buford Highway.

Police prevented non-residents from entering the complex Saturday. The only exceptions were a newspaper delivery woman and, later Saturday afternoon, two members of the Church of Jesus Christ of Latter-day Saints who entered on bicycles, because they said they had an appointment with a resident. They soon realized they were in the wrong complex and left.

A half-dozen television cameras, positioned at the entrance to the complex and from the nearby complex, stayed trained on Jewell's apartment all day.

Jewell's blue Toyota pickup, which had been towed away and returned this week by the FBI, remained parked in front of his building.

Staff writer Richard Whitt contributed to this article.

## APPENDIX C

AT THE SCENE OF THE BLAST
'Hero' denies planting bomb
FBI interviews security guard in blast probe

By Kathy Scruggs
and Ron Martz
STAFF WRITERS
The Atlanta Constitution
July 31, 1996

The security guard who is suspected of planting a pipe bomb that killed two and injured more than 100 spectators was interviewed by

FBI agents for at least two hours Tuesday and released.

Richard Jewell, 33, was originally credited with saving scores of lives in Centennial Olympic Park when he reported a suspicious package to the GBI and began moving people away.

Monday the FBI turned its attention away from an Alabama militia group and began to focus on Jewell, who has a history of overzealous policing in Habersham County.

Tuesday afternoon Jewell said, "No, sir, I didn't," when asked by reporters Tuesday whether he planted the deadly bomb at the base of a tower early Saturday morning. "I'm sure they're investigating everyone who was in the area. To be honest, hearing that from y'all (press), I don't know whether that's fact or fiction."

Shortly after that he went to FBI headquarters, where he was interrogated. Jewell said the FBI has interviewed him five times about the bombing.

Tuesday night after he returned home, Jewell's Atlanta attorney Watson Bryant said, "I just spoke with Agent Don Johnson and he assured me that Richard Jewell is not a suspect. He is not a target. He had nothing to do with this except be a hero."

The FBI would not confirm the statement.

Jewell, a former Habersham County Sheriff's deputy, became the FBI's prime suspect in the bombing after his former bosses at Piedmont College saw him interviewed on television and tipped investigators to their suspicions.

Piedmont College President Ray Cleere said when he saw Jewell on CNN he contacted the GBI "because we felt he should be checked."

"His behavior here had been a little erratic," Cleere said. "He had been very sporadic and we felt he needed to be checked out further."

Describing Jewell as "almost too excitable," Cleere said they were worried that he would not fit in on a small college campus. "We're not really a police department. We're more of a public safety department, and Mr. Jewell is definitely interested in police work and investigative work."

He was hired as a part-time security guard in April, but after he was moved to full-time status for a few weeks, the college had second thoughts. "To be perfectly honest, after a conversation with him, we weren't sure this was the right setting for him," Cleere said.

He quit in May and went to work for Borg-Warner Security, where he was assigned to protect AT&T Global Village at Centennial Olympic Park. Later, when Anthony Davis Associates took over the contract, he went to work for them.

Bryant Steele, spokesman for AT&T and the man who ferried Jewell from interview to interview after he was proclaimed a hero,

said, "We are shocked to hear about these allegations. Like everyone else, we hope the FBI gets to the bottom of this quickly and brings those responsible to justice."

Investigators now say Jewell fits the profile of a lone bomber, and they believe he placed the 911 call himself. This profile generally includes a frustrated white man who is a former police officer, member of the military or police "wannabe" who seeks to become a hero.

Jewell left the Habersham County Sheriff's Department after he was demoted for crashing his patrol car into another patrol car. Shortly after that, he was arrested on charges of impersonating an officer when he tried to arrest someone in DeKalb County.

Since the bombing, Jewell has become the celebrity police believe he always wanted to be. He appeared this morning at the reopened park with Katie Couric on the Today Show. He also has approached newspapers, including The Atlanta Journal-Constitution, seeking publicity for his actions.

When asked how it feels to be a hero, he said "I don't know how a hero's treated. I will say everyone's been nice."

"I don't think anything prepares you for what happened the other night," Jewell said. "I hope I don't have to go through anything like this again. I hope no one has to go through anything like this again."

He has told members of the media that he spotted a suspicious knapsack near the tower that was damaged in the blast. He said he reported the find to the GBI agent and helped move people from the area.

FBI agents are reviewing hours of professional and amateur videotape to see whether Jewell is spotted setting down the military-issue backpack that contained the bomb. Acquaintances have told agents that he owned a similar knapsack. Agents have not seen Jewell in NBC tape of the 20 minutes after the blast.

Investigators will check for a voice match on the tape of the 911 call, and three of the telephones along the bank of phones from which the warning call was placed were dismantled and sent to Washington for analysis.

Agents also are checking an earlier report from a plumber that pipes were stolen from his construction area near the park.

Staff writers Maria Elena Fernandez and Kent E. Walker contributed to this article.

## APPENDIX D

A long wait in the shadows after his moment in the sun

DAVE KINDRED
AT LARGE
August 1, 1996
The Atlanta Constitution

He sat in the shadows with his back to the world. He wore a white T-shirt, white shorts and black sneakers. Occasionally, he turned his thick body and looked through the staircase toward the firing line of cameras, every lens fixed on him.

He sat on the stairs outside his mother's apartment because, inside, federal agents were at work.

They brought in a dog, a ladder and boxes. Men wore latex gloves. A white van with Virginia tags unloaded members of the FBI Evidence Response Unit.

They were at work executing a search warrant in Apartment F3 at the Monaco Station Apartments, 3649 Buford Highway.

He sat there, waiting.

He sat seven miles from Centennial Olympic Park.

Hero or fool, he sat on the steps and leaned to his right to make room for agents passing on the staircase. An agent might sit with him awhile, talking about whatever FBI agents talk about with men who are suspects in murderous bombings.

Once upon a terrible time, federal agents came to this town to deal with another suspect who lived with his mother. Like this one, that suspect was drawn to the blue lights and sirens of police work. Like this one, he became famous in the aftermath of murder.

His name was Wayne Williams.

This one is Richard Jewell.

He sat with his back to us as two dozen federal agents did their work. They started at 9 o'clock Wednesday morning. By 2 o'clock, they had come from the apartment with only one box of stuff—a search either painstakingly slow or simply frustrating.

The crowd of reporters and photographers waited across a small parking lot. A television helicopter arrived, circling the encampment for a few minutes. On the second-floor landing above Apartment F3, two FBI agents could be seen in conversation.

"Reading the body language," said Dave Busse, a television photographer from Los Angeles' KABC, "the agent in the blue shirt there has been up all night and he's saying, 'We're not finding anything.'"

"And the other guy is on the cell phone every 10 minutes to Washington saying, 'We can't put a guy in jail with what we've got here.' "

He sat with his back to us. He'd sat with network television stars this week. Now he sat in the shadows, alone, making room when a neighbor, Leonard Shinew, came down the stairs, pausing to put his hand on the man's shoulder.

"I just said, 'Are you all right, Richard?' " Shinew said. "He said, 'OK.' "

Shinew is 78 and has lived in the Monaco complex 10 years. "Richard's just a regular fella. If you needed something done, who should you ask? Richard. Get my car started. Give me a ride somewhere. Regular fella, and I don't want him and his mother to have to move out. They're good neighbors, like everybody here."

Maybe the regular fella had nothing to do with the bomb; the FBI has often sat on a suspect and come up empty. But when the FBI sat on Wayne Williams in 1981, it gathered enough to convict him for two murders and to clear 20 more.

Ken Hawkins remembers. A free-lance photographer who covered Williams and now works this story, he said, "Did you see the FBI take those little vacuum cleaners into Jewell's apartment? It's exactly what they did with Wayne Williams. And, like this one, they were at Williams' place all day."

Richard Jewell sits in the shadows today.

Wayne Williams sits in prison forever.

## *APPENDIX E*

CENTENNIAL PARK BOMBING
SEARCH GOES ON
In pursuit of answers, agents combed the belongings of the man earlier hailed as a hero.

By Kathy Scruggs
STAFF WRITER
August 1, 1996
The Atlanta Constitution

Every piece of Richard Jewell's life was photographed, categorized and filed Wednesday by federal agents investigating the Centennial Olympic Park bombing.

They carried boxes out of the security guard's apartment from early afternoon until dusk, hauled away his pickup truck and even carried out what appeared to be his rug, wrapped in plastic.

By 5 p.m., officers had driven away a truckload of potential

evidence and were still loading a van. One officer carried out a stack of videotapes 3 feet high.

Experts also were still looking at the bomb that resulted in two deaths and injured more than 100 during a concert in the park early Saturday morning. Police said the package contained three 10-inch-long pipe bombs made of galvanized steel pipe, weighing a total of at least 15 pounds. Although all three bombs were meant to explode simultaneously, only one went off.

Each pipe bomb was wrapped in duct tape, and under each layer of duct tape was a layer of nails. A plastic container of nails was placed on top of the bombs, a ploy to maximize destruction, officials said.

The bomb, detonated by a wind-up clock timer, can be made on a desk top. It was very unstable and a risk to whoever carried it into the park.

An intact nail 3 inches long was pulled from the abdomen of the 44-year-old Albany woman killed by the blast, Assistant Fulton County Medical Examiner Kris Sperry said Wednesday.

Alice Hawthorne was "struck a total of six times," in the left arm, right hand, head, chest, abdomen and left leg, Sperry said.

"She was dead instantaneously from the head wound," Sperry said. "I think everything hit her within a microsecond."

Another victim was Melih Uzunyol, 40, who "sustained a heart attack that was aggravated by the stress surrounded by the bomb explosion," Assistant Fulton County Medical Examiner Kris Sperry said Wednesday.

According to sketchy public accounts, Jewell apparently pointed out a knapsack to police a few minutes after 12:45 a.m. At 12:58 a.m., phone logs show, the 911 call came in to police from a pay phone three blocks from the scene. The device exploded about 25 minutes later.

Investigators say the walk from the tower to the pay phone takes eight minutes.

FBI Special Agent David Tubbs said agents spent Tuesday seeking evidence from Jewell's home and that Jewell, 33, has been cooperative with authorities.

Among the things law enforcement officers would be looking for are wires, a clock similar to the one used as a timer or any receipt or evidence of such a clock and piping. A vacuum would be used to suck up any traces of gunpowder.

Jewell, who investigators believe planted the bomb so he could then be a hero, sat on the steps of his apartment for much of the search process.

Federal agents arrived at Jewell's apartment and began the search about 9:10 a.m. Agents with the FBI and Bureau of Alcohol,

Tobacco and Firearms carried trunk-sized containers into Jewell's apartment in the Monaco Station complex on Buford Highway.

Neighbors were escorted to another part of the complex by law enforcement officers, and the reporters maintaining a vigil were kept at a distance from them.

Jewell is a former Habersham County sheriff's deputy and became the FBI's prime suspect in the bombing after the president of Piedmont College saw him interviewed on television and tipped investigators to his suspicions.

But some who know him do not believe Jewell is capable of such an act of terrorism.

Neighbor Leonard Shinew said that Richard Jewell was a "very nice and cooperative fellow." When asked whether he thinks Jewell could have committed the bombing, the man said very sharply, "Bull!"

When Jewell modestly said he was not a hero even though he had been proclaimed one in the media, Shinew said he told the younger man, "A hero is an individual who is willing to sacrifice his life for other people," and that's what Shinew thinks Jewell did.

In addition to the investigation, federal officials have responded to the bombing by significantly beefing up the number of security personnel in Atlanta.

In addition to 400 Georgia National Guard members and state law enforcement personnel, they have added 900 federal officers and about 300 federal employees.

DECIDED JULY 13, 2011 —
RECONSIDERATION DENIED JULY 28, 2011 — ▮▮▮▮▮▮▮▮▮

*Wood, Hernacki & Evans, L. Lin Wood, Jr., Stacey G. Evans, Bryan, Cave, Powell & Goldstein, Nicole J. Wade*, for appellant.
*Dow Lohnes, Peter C. Canfield, Thomas M. Clyde*, for appellees.