**SECOND DIVISION**
**RICKMAN, C. J.,**
**MILLER, P. J., and PIPKIN, J.**

**NOTICE: Motions for reconsideration must be**
*physically received* **in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**July 1, 2022**

# In the Court of Appeals of Georgia

A22A0189. JOHNSON v. LINDSAY POPE BRAYFIELD & ASSOCIATES, INC. et al.

Rᴜᴄᴋᴍᴀɴ, Chief Judge.

Appellant Gary W. Johnson brought this action for discrimination, wrongful discharge and defamation against his former employer, Lindsay Pope Brayfield & Associates, Inc. (LPB), and others. On appeal from the grant of summary judgment to defendants, Johnson argues that the trial court erred because the Georgia Equal Employment for Persons with Disabilities Code (OCGA § 34-6A-1 et seq. [the "Georgia Act"]) required defendants to make reasonable accommodation for his hearing loss and because questions of material fact also remain concerning his wrongful discharge and defamation claims. We find no error and affirm.

"Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. We review a grant or denial of summary judgment de novo and construe the evidence in the light most favorable to the nonmovant." (Citations omitted.) *McRae v. Hogan*, 317 Ga. App. 813, 815 (1) (732 SE2d 853) (2012).

So viewed, the record shows that LPB, an architectural firm, employs more than 30 people. Johnson, a licensed architect, began working with the firm in 2016. He suffers from hearing loss and tinnitus and informed the company on an emergency information form that he was hearing-impaired. In 2017, Johnson obtained hearing aids, which pick up sound in his vicinity as well as ambient sounds in the distance, but he can neither adjust them nor control frequencies or volume. Without them, Johnson can engage in conversation only by reading lips. Johnson's workstation was on the third floor next to another employee, Jim Lord. LPB's president, Winford Lindsay, was Johnson's supervisor, and Lindsay also supervised Lord. Johnson never received a written performance evaluation, but he received a bonus at the end of each calendar year.

In November 2017, Lindsay told Johnson that Lord had complained about the "noise [Johnson] generated" and had asked to be relocated. Lindsay asked Johnson

2

to "cut back" on his noisemaking and to try not to speak loudly, suggesting that his tendency to do so may have been linked to his use of hearing aids. Two days later, Lindsay told Johnson that due to a "reorganization," Johnson should consider moving to a workstation on the first floor. Johnson visited that location and found that it had a glass wall, was close to the street, and had exposed metal and duct work with no acoustic panels and wood and ceramic floors, and lacked rugs or carpets. Johnson also observed other sources of noise, including street traffic, and noted that he would be seated across from the elevator and two restrooms, with frequent deliveries and visitors via the front door. Another employee on the first floor described the location as "a lot louder" than the third and "a distracting place to work," and said that Johnson would likely not be able to "tune out" the noise or to perform his job properly there.

Johnson told Lindsay that he could not work on the first floor because of the noise there and remained on the third floor for a while. In December 2018, however, Lindsay again proposed that Johnson relocate to the first floor. In an email dated January 4, 2019, Johnson responded with a request that he remain on the third floor. Lindsay responded that he was not "happy with [Johnson's] reply" and asked that Johnson let him know if the proposed move was "a deal breaker." In an email sent to

the print room manager, however, Lindsay characterized Johnson's response as "grumbling" and asked the manager to move Johnson's items to the first floor work station on January 5.

On arriving on the third floor of the office that day, Johnson discovered that many of his items had been moved, went down to the first floor, and yelled at the manager, who was still in the process of moving Johnson's things. In the course of this altercation, Johnson told the manager that he was going to resign and that "he was done working here." Shortly afterward, Johnson apologized and asked for some boxes. The manager contacted another employee, who called Lindsay. Lindsay emailed the other principals at LPB to inform them that Johnson "[s]aid he was quitting" and directed the IT manager to "unplug [Johnson] asap." A few minutes later, Lindsay sent another email stating, "No two weeks/severance. He quit, or if he equivocates on that, he is fired for cause." After a series of emails as to whether Johnson had quit or had been fired, Lindsay noted that he "was happy to hear [Johnson] was quitting (no severance required), so [I] enacted the departing employee protocol."

On the following day, Lord emailed the principals as follows:

In light of the events at the office yesterday with Gary Johnson[,] I will work from home tomorrow, Monday[,] and perhaps longer. His behavior yesterday was described to me as a RAMPAGE. I don't feel the office is a secure environment. Gary Johnson is clearly mentally ill, aggressive[,] and a strong proponent of the NRA. He has brought firearms (plural) to the office previously, and he has an active key fob in his possession. I was told that he threatened some unpleasant interaction with [Lindsay for] Monday morning. Don't be fooled if he cools down and apologizes. Gary Johnson is unstable and a strong candidate for a mass shooting.

On January 7, Lindsay informed Johnson that he had accepted his resignation in accordance with Johnson's "public notice" and gave Johnson additional instructions as to the end of his employment.

Johnson filed suit against LPB, Lord, and others, alleging discrimination under the Georgia Act, wrongful discharge, libel, and tortious interference with an employment relationship. Defendants moved for summary judgment. After a hearing, the trial court granted the motion on the grounds that the Act did not require LPB to make reasonable accommodation for Johnson, who was an at-will employee, and that the statements in Lord's email were hyperbolic expressions of opinion not published to a third party and thus not actionable. This appeal followed.

5

1. Johnson first argues that because the Georgia Act prohibits discrimination on the basis of a disability, defendants were obligated to provide reasonable accommodation for his disability. We disagree.

Although the federal Americans with Disabilities Act ("ADA"), 42 USC § 12101 et seq., contains a provision requiring an employer to make reasonable accommodation for an employee with a disability, see id. at § 12112 (b) (5) (A), the Georgia Act contains no such requirement.

The principles governing our analysis of the relevant statutory provision, OCGA § 34-6A-4, are familiar:

> When we consider the meaning of a statute, we must presume that the General Assembly meant what it said and said what it meant. To that end, we must afford the statutory text its plain and ordinary meaning, we must view the statutory text in the context in which it appears, and we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would. . . Applying these principles, if the statutory text is clear and unambiguous, we attribute to the statute its plain meaning, and our search for statutory meaning is at an end.

(Citations and punctuation omitted.) *Deal v. Coleman*, 294 Ga. 170, 172-173 (1) (a) (751 SE2d 337) (2013). Specifically, and consistent with the fundamental separation

6

of powers between legislative and judicial branches of government, a court "cannot add language to a statute by judicial decree." *Moosa Co. v. Commr. of Ga. Dept. of Revenue*, 353 Ga. App. 429, 432 (838 SE2d 108) (2020). Expert commentators have noted, moreover, that the Georgia Act is "unique," with "[n]o other state law or regulation" defining disabilities in the same way. James Wimberly, Georgia Employment Law (4th ed. 2008), § 7:18, p. 396; see also *Bowers v. Estep*, 204 Ga. App. 615, 619 (3) (420 SE2d 336) (1992) (given the unambiguous exclusion of disorders such as claustrophobia and depression from OCGA § 34-6A-2 (2)'s definition of "mental impairment," a plaintiff could not maintain his discrimination claim under the Georgia Act arising from those conditions).

With these principles in mind, we turn to OCGA § 34-6A-4, which provides in relevant part:

> (a) No employer shall fail or refuse to hire nor shall any employer *discharge or discriminate against any individual with disabilities* with respect to wages, rates of pay, hours, or other *terms and conditions of employment* because of such person's disability unless such disability restricts that individual's ability to engage in the particular job or occupation for which he or she is eligible; nor shall any employer *limit, segregate, or classify individuals with disabilities in any way which would deprive or tend to deprive any individual with disabilities of employment opportunities or otherwise affect employee status* because

7

of such person's disability, unless such disability constitutes a bona fide
and necessary reason for such limitation, segregation, or classification.

(Emphasis supplied.) The same subsection also provides that it "shall not be construed to require any employer to modify his or her physical facilities or grounds in any way or exercise a higher degree of caution for an individual with disabilities than for any person who is not an individual with disabilities[.]" Id.

On its face, the statute does not require an employer to "accommodate" a disabled employee; rather, the statute requires only that the employer not "discriminate," nor "limit, segregate, or classify" a disabled person so as to "deprive [that person] of employment opportunities or otherwise affect employee status because of such person's disability[.]" OCGA § 34-6A-4 (a). The statute being "clear and unambiguous," "our search for statutory meaning is at an end." *Deal*, 294 Ga. at 173 (1) (a).

It is well-established that the burden of persuading a trier of fact that an employer "has intentionally discriminated against" an employee on the basis of a handicap "remains with [the employee] at all times." *Shaw v. W. M. Wrigley, Jr., Co.*, 183 Ga. App. 699, 700 (1) (359 SE2d 723) (1987). Here, Johnson was asked to relocate to the first floor, where two other construction managers were already

8

working. Even at the time (December 2018), Johnson did not dispute management's claim that his move to the first floor would "better align individuals with working groups." But even if Johnson had a factual basis for concluding that his request to remain on the third floor was reasonable, he cannot show that defendants violated the law in refusing to accommodate him. The Georgia Act is not "ambiguous" in failing to speak on the matter of reasonable accommodation, and we cannot fill that silence, maintained for more than 40 years,[1] with a penalty for an employer's decision not to accommodate on routine matters such as an office assignment. As the Supreme Court of Georgia recently emphasized, "it is not for this Court to expand or contract the scope of the General Assembly's legislative enactments, unless the policy choices it makes by enacting statutes exceed its constitutional authority." *McEntyre v. Sam's East, Inc.*, 313 Ga. 429, 432-433 (2) (a) (870 SE2d 385) (2022).

Our conclusion that the Georgia Act does not require an employer to make "reasonable accommodation" for a disabled employee is supported by our decision in *Allen v. Bergman*, 198 Ga. App. 57 (400 SE2d 347) (1990), where we held that a visually impaired teacher was not authorized to maintain a cause of action against a

---

[1] See, for example, the revisions made to OCGA § 34-6A-4 at Ga. L. 1989 p. 14, § 34 and Ga. L. 1995, p. 1302, § 4.

county school board that transferred her to a school more distant than that to which she had previously been assigned. Id. at 57-58 (2). The employment contract in *Allen* gave the school system "the right to place [the plaintiff] anywhere in the system based on the needs of the system." Id. at 58 (2). Although that plaintiff argued that "the defendants discriminated against her because of her visual problem," we noted that she had "produced no evidence to show she was treated any differently from any able-bodied employee of defendants." Id. Likewise, defendants' request that Johnson move to a workstation where others of the same rank and responsibility were already sitting does not amount to treating him "differently from any [other] able-bodied employee[.]" Id.

In short, based on the unambiguous terms of the Georgia Act, defendants had no legal responsibility to accommodate Johnson's request that he not be reassigned from the third floor to the first floor. Because the only basis for plaintiff Johnson's discrimination claim was defendants' failure to accommodate him in this way, the trial court did not err when it concluded that the employer was entitled to summary judgment on his discrimination claims.[2]

---

[2] As the foregoing makes clear, we cannot participate in the dissent's search for legislative intent in the preamble. We have seen no case using a preamble as a source for adding missing terms to an unambiguous statute. See, e.g., *Murphy v. Murphy*,

2. As a general rule, "the employee-at-will doctrine preclude[s] employees from bringing a tort action against their employers for wrongful discharge." *Reilly v. Alcan Aluminum Corp.*, 272 Ga. 279, 280 (1) (528 SE2d 238) (2000); see also OCGA § 34-7-1. Johnson's wrongful discharge claim was based solely on his employer's failure to make a reasonable accommodation for his hearing loss, which we have determined cannot support a discrimination claim. Because the basis of his claim was thus not his opposition to any "practice made an unfair employment practice by" the Georgia Act, which is the prerequisite for a claim that a firing was retaliatory, OCGA § 34-6A-5,[3] the trial court also did not err in granting summary judgment on Johnson's wrongful discharge claim. See *Reilly*, 272 Ga. at 280-281 (1) (the specific provisions of the Georgia age discrimination statute show that the General Assembly "did not intend

295 Ga. 376, 377 (761 SE2d 53) (2014) (referring to preamble to help determine the retroactivity of an amendment); *Perdue v. Baker*, 277 Ga. 1, 2 (586 SE2d 606) (2003) (discussing uncodified Act, rather than its preamble, to explain the history of a dispute). Compare *Crews v. Wahl*, 238 Ga. App. 892, 897-898 (2) (520 SE2d 727) (1999) (preamble to OCGA § 43-3-32 (a) supports the *omission* of some communications between an accountant and a client from the categories protected by the statute).

[3] The statute provides: "No employer shall discharge, expel, refuse to hire, or otherwise discriminate against any person or applicant for employment because such person has opposed any practice made an unfair employment practice by this chapter[.]"

11

for age-discrimination to provide the basis for a tort of wrongful discharge in this State").

3. Johnson also argues that the trial court erred when it granted summary judgment on his defamation claim. Again, we disagree.

> Generally, there are four elements in a cause of action for defamation: (1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communcation to a third party; (3) fault by the defendant amounting at least to negligence; and (4) special harm or the actionability of the statement irrespective of special harm.

(Citation and punctuation omitted.) *Swanson Towing &Recovery, LLC v. Wrecker I, Inc.*, 342 Ga. App. 6, 10 (2) (802 SE2d 300) (2017). "A defamation action will lie only for a statement of fact. This is because a statement that reflects an opinion or subjective assessment, as to which reasonable minds could differ, cannot be proved false." Id. at 10 (2) (a). "An assertion that cannot be proved false cannot be held libelous . . . , however unreasonable the opinion or vituperous the expressing of it may be." (Citation and punctuation omitted.) *Gast v. Brittain*, 277 Ga. 340, 341 (589 SE2d 63) (2003). A statement of opinion may be actionable, then, if it "can reasonably be interpreted as stating or implying defamatory facts about plaintiff" and

12

is capable of being proven false. (Citation and punctuation omitted.) *Bryant v. Cox Enterprises*, 311 Ga. App. 230, 235 (III) (715 SE2d 458) (2011).

Here, Lord's statement that Johnson had gone on a "rampage" was a subjective assessment of Johnson's behavior. Likewise, Lord's assertion that Johnson was "a strong candidate for a mass shooting" was an expression of opinion. See *Swanson Towing*, supra, 342 Ga. App. at 11 (2) (a) (statement that plaintiffs had "no morals" and were "mean, vulgar, demeaning crooks" was a matter of opinion); *Bryant*, supra, 311 Ga. App. at 242-243 (III) (newspaper column comparing plaintiff to a convicted child serial killer was not defamatory). Lord's statements that Johnson was "unstable" and "clearly mentally ill" were hyperbolic, and the average person would not have understood these characterizations as asserting that Johnson had been diagnosed with any specific mental disorder. See *Lucas v. Cranshaw*, 289 Ga. App. 510, 514 (1) (659 SE2d 612) (2008) ("rhetorical hyperbole" cannot form the basis of a defamation claim); *Cook-Benjamin v. MHM Correctional Svcs.*, 571 Fed. Appx. 944, 947 (II) (11th Cir. 2014) (statement that plaintiff was "crazy" was not actionable under

13

Georgia defamation law). It follows that the trial court did not err when it granted summary judgment on Johnson's defamation claim.

*Judgment affirmed. Pipkin, J., concurs. Miller, P. J., concurs in Division 3 and dissents as to Divisions 1 and 2.*

# In the Court of Appeals of Georgia

A22A0189.   JOHNSON v. LINDSAY POPE BRAYFIELD & ASSOCIATES, INC. et al.

MILLER, Presiding Judge, concurring in part and dissenting in part.

When the Georgia legislature enacted the Equal Employment for Persons with Disabilities Code, it explicitly intended to protect the right of disabled employees to fully participate in the workplace. The primary reason that an employee with a disability needs reasonable accommodation is because of the disability itself. In my

15

view, therefore, an employer's refusal to provide reasonable accommodation is inherently discriminatory and violates the Code, and I would reverse the trial court's dismissal of Johnson's claims for employment discrimination and wrongful discharge. Accordingly, I strongly dissent to Divisions 1 and 2 of the majority opinion.

If an employee with a disability is able to perform the demands of their position with reasonable accommodation, and the employer outrightly refuses to provide such accommodation, this could surely be construed as evidence of disability discrimination if the employee is knowingly placed in a position to fail at their job duties. In such a case, the employee is effectively denied the opportunity to work solely because of their disability. Johnson's employer knew of his hearing impairment and his use of hearing aids. After examining the noise level on the first floor, Johnson repeatedly informed his supervisor that he would be unable to work effectively on the first floor given the excessive noise. And Johnson made a simple request to remain at his third floor workstation where he had been successfully performing his job for years. Johnson's request was neither onerous nor burdensome, and it did not engender any cost to his employer. Further, Johnson did not refuse to work in the absence of an accommodation, and he never notified his supervisor of any intention to quit his job. Yet, LPB's response to Johnson's request was as callous as it was deliberate.

16

Johnson's supervisor labeled him a disgruntled employee, ordered that Johnson's work supplies be moved to the first floor during the weekend hours, and never even considered any alternative placement for Johnson. This abject unfairness is the essence of disability discrimination.

The Code was enacted to address the interests of society in providing an opportunity for disabled individuals to work. *Dugger v. Delta Air Lines, Inc.*, 173 Ga. App. 16, 18 (325 SE2d 394) (1984). Further, this Court is charged with interpreting the law in accordance with both the text itself and "all that the text fairly implies." (Citation omitted). *Monumedia II, LLC v. Dept. of Transp.*, 343 Ga. App. 49, 55 (1) (806 SE2d 215) (2017). Although the Code does not define the term "discriminate," see OCGA §§ 34-6A-2, 34-6A-4, discrimination can encompass unfair or unjust treatment. Specifically, the term "discrimination" can mean "the practice of treating one person or group of people less fairly" than others, Collins Dictionary,[4] or "the unjust . . . treatment of different categories of people, especially on the grounds of . . . disability." The Oxford Dictionaries.[5]

---

[4] https://www.collinsdictionary.com/dictionary/english/discrimination.

[5] http://www.oxforddictionaries.com/definition/english/discrimination.

Thus, the question of whether Johnson faced disability discrimination is not simply a matter of whether he was treated differently from the other employees, since a person can *also* be discriminated against when they receive treatment that is unfair or unjust. Because the term "discriminate" is capable of various meanings, this Court has a duty to interpret the statute so as to carry out the legislative intent. *Aldrich v. City of Lumber City*, 273 Ga. 461, 464 (542 SE2d 102) (2001). And this case poses no difficulty in discerning the purpose of the Code — to eliminate employment discrimination against persons with disabilities and to safeguard their right to participate in the workplace.

The uncodified preamble to the statute (Ga. Laws 1981, p. 1803) states:

It is the intent of the General Assembly to guarantee to handicapped individuals the fullest participation in the social and economic life of the state and to guarantee their right to engage in remunerative employment. The right to lawful employment, without discrimination because of handicap, where the reasonable demands of the position do not require such a distinction, is hereby recognized as and declared to be the right of all the people of this state and it is the policy of this state to protect such rights.[6]

---

[6] *Grogan v. City of Dawsonville*, 305 Ga. 79, 88 (3) (823 SE2d 763) (2019) (uncodified language may be considered where a statute is ambiguous).

18

In the workplace, individuals with disabilities may not be equally situated to those who have no such impairments. See OCGA § 34-6A-2 (3)-(4) ("Individual with disabilities" means a person who has a record of a physical or mental impairment which "substantially limits" one or more of the person's major life activities, including "working"). Nevertheless, these individuals are guaranteed the right to engage in employment *without discrimination*, just as everyone else in the state of Georgia. Ga. Laws 1981, p. 1803.

Therefore, I would find that an employer's obligation to provide reasonable accommodation is impliedly embedded in the Code, so as to account for a person's disability. Any contrary interpretation strips the Code of its efficacy and largely defeats its legislative purpose. It is patently unfair and unjust to deny an employee the opportunity to work at their place of employment simply because they have disability-related needs. In my judgment, therefore, LPB had a legal duty to reasonably accommodate Johnson, and it is disingenuous to claim otherwise.[7] See 14A C.J.S.

---

[7] Thus, I would also reverse the trial court's dismissal of Johnson's claim for wrongful discharge. Although Johnson was an at-will employee, the Code represents a "public policy exception[] to the proposition that the employment of an at-will employee can be terminated for any reason whatsoever or for no reason at all." *Borden v. Johnson*, 196 Ga. App. 288, 289-290 (1) (395 SE2d 628) (1990). Therefore, Johnson could not lawfully be terminated where he opposed an "unfair employment practice." OCGA § 34-6A-5.

Civil Rights § 315 ("An employer, under a state disability discrimination statute, generally must make a reasonable accommodation for an employee's disability, unless to do so would impose undue hardship[.]"); *Belton v. Ga.*, No. 1:10-CV0583-RWS, 2012 WL 1080304, *9 (N.D. Ga. Mar. 30, 2012) (unpublished) (explaining, for purposes of a claim under the ADA, that "a person with a disability may be the victim of discrimination precisely because [he] did not receive disparate treatment when [he] needed accommodation. In the context of disability, therefore, equal treatment may not beget equality[.]") (citation omitted).

The Court's decision today shows that it has made no meaningful attempt to either confront the realities of disability discrimination or acknowledge that disabled individuals who seek to work may have limitations that necessitate accommodation. It is paradoxical and disturbing to allow covered employers to shirk all responsibility to provide reasonable accommodation when requested, and yet expect individuals with disabilities to "fully" participate in the economic life of this state. Yet, this is precisely what the majority permits. Today's decision could enable a covered employer to wholly ignore an employee's disability and their reasonable needs as a disabled individual. Certainly, this is not the result that the General Assembly intended when it sought to safeguard the employment rights of the disabled and

protect them from discrimination in the workplace. Because I cannot agree to perpetuate such inequity, I respectfully dissent.