**SECOND DIVISION**
**RICKMAN, C. J.,**
**MILLER, P. J., and PIPKIN, J.**

**NOTICE: Motions for reconsideration must be**
***physically received*** **in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**November 3, 2022**

# In the Court of Appeals of Georgia

A22A0877. EQUITY PRIME MORTGAGE v. GREENE FOR
CONGRESS, INC. et al.

PIPKIN, Judge.

Appellant Equity Prime Mortgage ("EPM") sued Appellees Marjorie Taylor

Greene and Greene for Congress (collectively "Greene") for defamation and false light

invasion of privacy. The action stems from Greene's social media posts and political

advertisements made in connection with EPM's June 2020 firing of Melissa Rolfe

("Rolfe").[1] On Greene's motion, the trial court dismissed the action pursuant to Georgia's

anti-Strategic Lawsuits Against Public Participation ("anti-SLAPP") statute, OCGA § 9-

11-11.1. EPM now appeals. While we agree with the trial court that Greene's speech was

---

[1] Melissa Rolfe is a party to the action but is not a party to this appeal. This opinion
includes reference to Rolfe's son, Garrett, but all references to "Rolfe" here mean only
Melissa Rolfe.

made in connection with "an issue of public interest or concern," as that phrase is used in the anti-SLAPP statute, we also conclude that the trial court failed to properly consider the second step of the anti-SLAPP analysis. Because the trial court's analysis did not conform to the strict inquiry mandated by decisions of the Supreme Court of Georgia, we affirm in part and vacate in part, and we remand for further consideration of Greene's motion.

1. "In cases at the margin, it may sometimes be difficult to figure out what constitutes speech protected by the First Amendment. But this is not a hard case in that respect." *Wollschlaeger v. Governor, Fla.*, 848 F3d 1293, 1307 (III) (A) (11th Cir. 2017). Here,[2] Rolfe began working for EPM as a Human Resources Director in February 2020. On June 12, 2020, Rolfe's stepson, Garrett, while employed as police officer in Atlanta, was involved in a shooting that resulted in the death of Rayshard Brooks; a few days later, Garrett was charged with numerous offenses, including felony murder. While EPM initially sent supportive messages to Rolfe and granted her eight weeks of paid leave to deal with the fallout from the incident, EPM terminated Rolfe's employment in a brief

---

[2] We recount the facts and procedural history with the understanding that we view the pleadings and affidavits in this case in a light most favorable to EPM. See *ACLU v. Zeh*, 312 Ga. 647, 652-653 (1) (c) (864 SE2d 422) (2021).

telephone call on June 18, 2020, the day after the charges against Garrett were announced. There is no dispute that, during that telephone call, Rolfe did not ask why she was being fired, and EPM did not provide a reason.

Around this time, Marjorie Taylor Greene was a congressional candidate who "emphasized her support for law enforcement" and centered her campaign around her vocal support for "'Back the Blue,' a political movement that . . . counter[ed] to demands to 'defund the police.'" Following the shooting of Rayshard Brooks, then-candidate Greene took to social media to voice her support for Garrett and his stepmother. After learning of Rolfe's firing, Greene posted the following message on social media:

> I am praying for my friend Melissa Rolfe and her family. First, her step son (who was acting in self defense) lost his job [and] was charged with murder! Then[,] Melissa's employer caved to the mob and wrongfully fired her! The war on our police officers and their families must end!

Shortly thereafter,[3] Greene also posted the following:

> Officer Rolfe's stepmother, Melissa, has been fired from her job and been treated very unfairly. As Northwest Georgia's next Congresswoman, she will be one of my constituents.

Rolfe's story was later mentioned on the television show, "Tucker Carlson Tonight," during which the host remarked that Rolfe was "fired from her job today at a place called Equity Prime Mortgage . . . we told you she was fired with no explanation, obviously because they disapproved of who her stepson was." Soon after the news of Rolfe's firing was publicized, EPM was "bombarded" with thousands of website hits,"furious messages," and threats; consequently, EPM issued a statement clarifying that Rolfe's employment was terminated because "she [had] violated company policy" and had created "a hostile working environment."

A few days later, Rolfe appeared on "The Glenn Beck Program," during which she discussed her firing and explained that she did not know why she was let go from EPM;

---

[3] While social media posts often include a timestamp, many of the digital images of Greene's social media posts in the record do not. We also note that it is inconsequential that the speech here occurred on social media. "[W]hatever the challenges of applying the Constitution to ever-advancing technology, the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary when a new and different medium for communication appears." (Citation and punctuation omitted.) *Brown v. Ent. Merchants Ass'n*, 564 U. S. 786, 790 (II), (131 SCt 2729, 180 LE2d 708) (2011).

she agreed with the host's speculation that the hostile work environment referenced in EPM's public statement could have been "cause[d] just by [her] presence, because of [her] son." At the end of June, Rolfe appeared on "Tucker Carlson Tonight" and claimed, among other things, that she had not "been in trouble with [EPM]" and that she believed EPM's "primary motive" in firing her was her association with Garrett. Throughout this period, then-candidate Greene continued to reference Rolfe and Garrett on social media and in her campaign materials; she posted screenshots from television coverage of Rolfe's firing, commenting that "Garrett has been treated HORRIBLY" and that "Melissa herself lost her job as a result of this nonsense." Later, in connection with her campaign, Greene distributed a letter of support drafted by Rolfe in which Rolfe praises Greene and recounts losing her job the day after Garrett was charged.

In August 2020, EPM sent a letter to Greene demanding that she retract her statements concerning Rolfe's firing and issue a public apology. The letter first recounts that, just a month after being hired, Rolfe was reprimanded for an inappropriate joke about taking "rectal temps" in the office, and that, the following month, she was again reprimanded, this time for calling employees "savages." The demand letter then details Rolfe's meeting with the CEO of EPM – which was conducted the day *before* the shooting – during which Rolfe was confronted with additional inappropriate and allegedly

5

racist comments that she had made in the workplace, including a comment about the size of an employee's breasts. At the conclusion of that meeting, Rolfe was advised that EPM would continue its investigation into her workplace behavior. The letter continues, explaining that, in Rolfe's subsequent absence following the shooting, a "flood of employees came forward and reported additional instances of . . . wildly unprofessional and hostile conduct," which resulted in the termination of Rolfe's employment. According to the letter, Rolfe knew or should have known that she was fired as a consequence of her inappropriate workplace behavior. According to EPM, Greene has "refused to correct [her] false statements and ha[s] continued to stand by them."

EPM's subsequent complaint, which reiterates Rolfe's tumultuous tenure, asserts claims of defamation and false light invasion of privacy against Greene and Rolfe. The complaint paints Greene and Rolfe as a pair of fabulists, alleging that they conspired to engage in a "smear campaign" by initially planting a false story of Rolfe's firing on "Tucker Carlson Tonight" and then by having Rolfe appear on "The Glenn Beck Program" and "Tucker Carlson Tonight" to reiterate the story. EPM also accused Greene of defaming EPM on social media by creating and then continuing a false narrative that Rolfe was terminated because of her association with Garrett. After answering, Greene moved to dismiss or strike the complaint pursuant to OCGA § 9-11-11.1, asserting that

6

her speech was a matter of public concern – namely, "'the war on police,' defunding the police and supporting the police and their families," which had been "subjects of riots, protests, rallies and continuous public debate and saturat[ed] news coverage" – and that EPM could not meet its evidentiary burden of showing a probability of success on its claims.

In a carefully considered order, the trial court granted the anti-SLAPP motion. First, the trial court thoughtfully concluded that "[t]he national debate over the conduct and role of law enforcement during the summer of 2020 was a matter of intense if not preeminent public concern at the time" and that Greene's speech in this case was part of that debate. Second, the trial court also concluded that EPM had failed to demonstrate a probability of success on its claims. Specifically, the trial court concluded that Greene' statements amounted to non-actionable opinion and, alternatively, were conditionally privileged. EPM now appeals.

2. "The First Amendment to the United States Constitution places substantial limitations on state defamation law." *ACLU v. Zeh*, 312 Ga. 647, 652-653 (1) (864 SE2d 422) (2021). Consistent with this constraint, Georgia's anti-SLAPP statute is designed to"encourage participation by the citizens of Georgia in matters of public significance through the exercise of their constitutional rights of freedom of speech and the right to

petition government for redress of grievances," OCGA § 9-11-11.1 (a), and to quash "meritless lawsuits brought not to vindicate legally cognizable rights, but instead to deter or punish the exercise of constitutional rights of petition and free speech by tying up their target's resources and driving up the costs of litigation," *Geer v. Phoebe Putney Health Sys., Inc.*, 310 Ga. 279, 282 (2) (849 SE2d 660) (2020). Thus, the First Amendment is our lodestar in this case, and this Amendment "reflects a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." (Citation and punctuation omitted.) *Snyder v. Phelps*, 562 U.S. 443, 452 (II) (131 SCt 1207, 179 LE2d 172) (2011). Indeed, "[s]peech on matters of public concern is at the heart of the First Amendment's protection." (Citation and punctuation omitted.) Id. at 451-452.

We start with a review of the plain language of Georgia's anti-SLAPP statute, which provides as follows:.

> A claim for relief against a person or entity arising from any act of such person or entity which *could reasonably be construed as an act in furtherance of the person's or entity's right of petition or free speech under the Constitution of the United States or the Constitution of the State of Georgia in connection with an issue of public interest or concern* shall be subject to a motion to strike unless the court determines that the nonmoving

8

party has established that there is a probability that the nonmoving party will prevail on the claim.

(Emphasis supplied.) OCGA § 9-11-11.1 (b) (1). Subsection (c) of OCGA § 9-11-11.1 explains that the phrase "'act in furtherance of the person's . . . right of petition or free speech . . . in connection with an issue of public interest or concern'" includes, as relevant here, the following:

(3) Any written or oral statement or writing or petition made in a place open to the public or a public forum in connection with an issue of public interest or concern; or

(4) Any other conduct in furtherance of the exercise of the constitutional right of petition or free speech in connection with a public issue or an issue of public concern.

OCGA § 9-11-11.1 (c) (3) and (4). Thus, in accordance with the plain language of the statute,

the analysis of an anti-SLAPP motion to strike [or dismiss] involves two steps. First, the court must decide whether the party filing the anti-SLAPP motion (here, [Greene]) has made a threshold showing that the challenged claim is one "arising from" protected activity. If so, the court must decide whether the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.

9

(Citations and punctuation omitted.) *ACLU v. Zeh*, 312 Ga. at 650 (1) (a). With respect to the first step,

> [t]he critical consideration is whether the cause of action is based on the defendant's protected free speech or petitioning activity. A defendant meets its burden by demonstrating that the act underlying the challenged claim 'could reasonably be construed as' fitting within one of the categories spelled out in [OCGA § 9-11-11.1 (c)].

(Citation, punctuation, and emphasis omitted.) *Wilkes & McHugh, P.A. v. LTC Consulting, L.P.*, 306 Ga. 252, 262 (2) (b) (830 SE2d 119) (2019). Turning to the second step, establishing a probability of success on the merits,

> the plaintiff must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited. The plaintiff's evidence is accepted as true; the defendant's evidence is evaluated to determine if it defeats the plaintiff's showing as a matter of law.

(Citations and punctuation omitted.) Id.

"Only a claim that satisfies both prongs of the anti-SLAPP statute – i.e., that arises from protected activity and lacks even minimal merit – is a SLAPP that is subject to being stricken." (Citation, punctuation, and emphasis omitted.) Id. at 262-263 (2) (b). We review the trial court's decision de novo. *ACLU v. Zeh*, 312 Ga. at 652 (1) (c).

10

(a) Our first task is to review whether Greene has made a threshold showing that EPM's cause of action "arises from" from protected activity. Here, the trial court concluded – and the record supports – that Greene's speech was part and parcel of her participation in the nationwide debate concerning support for police and policing in America. In response, EPM argues that courts from both Georgia and California[4] "have repeatedly held that anti-SLAPP statutes do not apply to statements about employment disputes because they are not matters of public interest or concern." EPM overstates its case.

It may be true that employment disputes are largely matters of private, rather than public, concern, see *Gettner v. Fitzgerald*, 297 Ga. App. 258, 263-264 (1) (c) (i) (677 SE2d 149) (2009), but nothing in the authority cited by EPM suggests that Greene's speech is necessarily excluded from consideration under OCGA § 9-11-11.1 merely because it touches on an employment dispute. Instead, determining whether speech involves a matter of public interest or concern is fact and circumstance dependant; indeed,

_____

[4] Because OCGA § 9-11-11.1 "substantially track[s] California's anti-SLAPP procedure as set out in California Code of Civil Procedure § 425.16," Georgia courts "may look for guidance to California's more extensive case law interpreting similar provisions of that state's anti-SLAPP code." *ACLU v. Zeh*, 312 Ga. 647, 653 (1) (c) n.6 (864 SE2d 422) (2021).

decisions from California courts – which form the bulk of the authority relied on by EPM – recognize that, while "garden-variety employment dispute[s] concerning a nonpublic figure will implicate no public issue," this standard may be upended in "unusual circumstances." *Wilson v. Cable News Network, Inc.*, 444 P3d 706, 725 (IV) (B) (Cal. 2019).

Moreover, unlike this case, the California cases on which EPM relies involve isolated employment decisions that have no relationship to an on-going matter of public interest or concern. See, e.g., *Wilson*, 444 P3d at 710 (CNN's termination of employee not protected conduct under the anti-SLAPP statute in a lawsuit alleging employment discrimination and retaliation claims by single employee); *Baughn v. Dept. of Forestry & Fire Protection*, 246 Cal. App. 4th 328, 338 (1) (Cal. Dist. Ct. App. 2016) (lawsuit arising from letter written by defendant detailing alleged sexual-harassment concerns sent by firefighter-plaintiff's previous employer to his prospective employer not matter of public concern that would be subject to dismissal under the anti-SLAPP statute)*; Olaes v. Nationwide Mut. Ins. Co.*, 135 Cal. App. 4th 1501, 1505-1511 (III-IV) (Cal. Dist. Ct. App. 2006) (internal sexual harassment investigation by company not protected conducted under the anti-SLAPP statute and unrelated to any broader public interest in "eradicating sexual harassment from the workplace"); *Rivero v. American Federation of*

12

*State, County, & Municipal Employees, AFL-CIO*, 105 Cal. App. 4th 913, 924-929 (III) (B) (Cal. Dist. Ct. App. 2003) (dispute between labor union and university employee, which was discussed in union publications, not matter of public issue or concern in defamation action brought by employee).

Returning to the appeal at hand, the record shows – and there can be no dispute – that, at the time of Greene's statements, there was widespread and intense debate over the use of force by law enforcement in multiple incidents in this country, and the shooting death of Rayshard Brooks became a significant part of that debate. Following the incident, Atlanta saw numerous protests – some of which turned violent and resulted in the destruction of property – which many understood to be connected to the officer-involved shooting. The subsequent prosecutorial decision to charge Officer Rolfe itself became the subject of an even more intense debate. With respect to Greene, after the shooting *but before EPM fired Rolfe*, Greene immediately commented on the incident; Greene expressed her solidarity with both Garrett and his family – as well as law enforcement generally – and voiced support for Melissa Rolfe by name. After Garrett was charged in connection with the shooting and EPM had made its employment decision, Greene used social media to, as the trial court explained, "w[eave] her criticisms of the termination into the same pro-law enforcement themes she had been previously

13

expressing on a regular basis," all of which were central to her campaign. "[T]he First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office." *Eu v. San Francisco County Democratic Central Committee*, 489 U. S. 214, 223 (II) (A) (109 SCt 1013, 103 LE2d 271) (1989).

EPM argues that Greene's remarks on Rolfe's firing were mere commentary on a "garden-variety employment dispute" between private parties. But context belies this superficial understanding. Instead, the speech here must be understood as a continuation of Greene's ardent participation in what was an all-consuming nationwide discourse.

> The First Amendment affords the broadest protection to such political expression in order to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people. . . . In a republic where the people are sovereign, the ability of citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation. . . . [I]t can hardly be doubted that constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office.

(Citations and punctuation omitted.) *Buckley v. Valeo*, 424 U. S. 1, 14-15 (I) (A) (96 SCt 612, 46 LE2d 659) (1975). In light of the circumstances of this case, and keeping in mind that the heart of the anti-SLAPP statute is the First Amendment, *Royalty Network, Inc.*

14

*v. Harris*, 756 F3d 1351, 1356 (III) (A) (11th Cir. 2014), we agree with the trial court that Greene made a showing that the speech underlying EPM's cause of action could reasonably be construed as fitting within one of the categories spelled out in OCGA § 9-11-11.1 (c).

(b) We turn now to the second step of the anti-SLAPP analysis. This step requires a court to determine whether the non-moving party has demonstrated that "the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." (Citation and punctuation omitted.) *Wilkes & McHugh*, 306 Ga. at 262 (2) (b). To accomplish this, the reviewing court accepts the evidence from the non-moving party as true, while the evidence from the moving party "is evaluated to determine if it defeats the [non-movant's] showing *as a matter of law*." (Emphasis supplied.) Id.

Here, the trial court did not consider EPM's pleadings and factual showings in the first instance; instead, the trial court merely assessed the merits of Greene's affirmative defenses – namely that her statements were non-actionable expressions of opinion or were conditionally privileged – to conclude that EPM could not demonstrate a reasonable probability of prevailing on its claims. However, the task in this second step is not to consider "the evidence to determine whether it is more probable than not that [EPM] will

15

prevail on the claim," but, rather, to focus on whether EPM has "state[d] and substantiate[d] a legally sufficient claim." (Citation and punctuation omitted.) Id. at 262 (2) (b). On remand, the trial court, "using a summary-judgment-like procedure at an early stage of the litigation," *ACLU v. Zeh*, 312 Ga. at 653 (1) (c), must first determine whether EPM's complaint is sufficient and then whether it is supported by a prima facie showing of facts that could support a favorable judgment. It is only if EPM fails to make this showing or if Greene can then produce evidence defeating EPM's claims *as a matter of law*,[5] that Greene's motion should be granted.[6]

Accordingly, we vacate this portion of the trial court's order, and we remand this

---

[5] We note that Greene's defenses typically involve fact questions that are not subject to summary resolution. See *RCO Legal, P.S., Inc. v. Johnson*, 347 Ga. App. 661, 672 (2) (c) (ii) (820 SE2d 491) (2018) (recognizing that questions of conditional privilege are generally reserved for a jury); *Bryant v. Cox Enterprises, Inc.*, 311 Ga. App. 230, 235 (III) (715 SE2d 458) (2011) (noting that whether a statement is one of pure opinion is decided by a court only where it "is so unambiguous so as to bear only one reasonable interpretation") (citation and quotation omitted).

[6] This analysis also requires the trial court to resolve EPM's "status as a 'private' or 'public' figure [to] determine[] the level of fault with which [EPM] must prove that [Greene] acted." See *ACLU v. Zeh*, 312 Ga. at 653 (1) (c).

matter for the trial court to revisit the second prong of the anti-SLAPP analysis.[7]

3. For the reasons discussed above, we affirm that portion of the trial court's order concluding that Greene's speech involved matters of public interest or concern as that phrase is used in OCGA § 9-11-11.1, but we vacate that portion of the trial court's order addressing the second step of the ani-SLAPP analysis; we remand this matter for the trial court to revisit its order consistent with this opinion.

*Judgment affirmed in part and vacated in part, and case remanded. Rickman, C. J., and Miller, P. J., concur.*

---

[7] This decision should not be read to express any opinion on the merits of EPM's claims. Instead, our holding rests, as it must, on settled precedent of the Supreme Court of Georgia broadly interpreting OCGA § 9-11-11.1, which compels the trial court to wade through this interwoven two-part inquiry.

17