**NOT FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 24-14151

Non-Argument Calendar

_____

JACKI PICK,

*Plaintiff-Appellant,*

*versus*

BRADFORD JAY RAFFENSPERGER,
   in his individual capacity,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:24-cv-01607-ELR

_____

Before JILL PRYOR, BRASHER, and BLACK, Circuit Judges.

PER CURIAM:

Jacki Pick sued Georgia Secretary of State Bradford Raffensperger in his individual capacity for defamation and false light

invasion of privacy based on statements she claimed he made about her in his 2021 book *Integrity Counts*, in which he discussed his role relating to challenges to the results of the 2020 Presidential election in Georgia. Pick argued that Raffensperger defamed her in his discussion of a video showing election workers in Atlanta on election night, which she presented to a Georgia Senate subcommittee in conjunction with a team of lawyers representing President Donald J. Trump for the purpose of arguing that irregularities and potential fraud occurred in how certain ballots were counted in Georgia that warranted vacating the election results. Specifically, Pick asserted that Raffensperger's references to the video as being "sliced-and-diced" and his pejorative statements about people who referred to certain official ballot containers as "suitcases," which she did during the hearing, damaged her reputation.

The district court dismissed Pick's complaint for failure to state a claim and denied a motion that she filed to transfer the action from the Northern District of Georgia Atlanta Division to the Gainesville Division in the same district. Pick appeals both rulings. After review,[1] we affirm.

## I. BACKGROUND

In April 2024, Pick filed a complaint against Raffensperger in the Northern District of Georgia. She then moved to transfer the

---

[1] "We review *de novo* a dismissal for failure to state a claim." *Maglana v. Celebrity Cruises Inc.*, 136 F.4th 1032, 1036 (11th Cir. 2025). We review a district court's denial of a motion to transfer venue for an abuse of discretion. *Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 255 (11th Cir. 1996).

case from the Atlanta Division to the Gainesville Division in the same district. She asserted that she initially filed the case in the Gainesville Division, but "the case was assigned to the Atlanta Division without her consent and without giving her a chance to respond" and without a motion filed by Raffensperger. She argued that the Gainesville Division was the mandatory division venue under N.D. Ga. Local Rule 3.1(B)(3) because that Rule required that "[a]ny civil action brought in [the Northern District of Georgia] on the grounds that the cause of action arose [t]here must be filed in a division of the district wherein the activity occurred," and "the only division venue ground Ms. Pick alleged is that events giving rise to her causes of action occurred in [the Gainesville Division]." For that reason, she concluded that the case should not have been assigned to the Atlanta Division without her consent or a court order, and the "assignment should be reversed."

In August 2024, Pick filed an amended complaint against Raffensperger, asserting claims of defamation[2] and false light invasion of privacy. She alleged the following facts in support of her claims: On December 3, 2020, a Georgia Senate subcommittee held a hearing "to learn about alleged election irregularities, misconduct, or fraud in the 2020 election." At that hearing, lawyers representing President Trump, including Rudy Giuliani, argued that the results of the 2020 Presidential election in Georgia should be

---

[2] Pick specifically characterized Count One of her complaint, which we refer to as her "defamation claim," as "defamation, civil libel—defamation per se, libel, libel per quod, libel by innuendo."

vacated.  During the hearing, Pick, who was acting as a volunteer and, although she was a lawyer, was not representing President Trump, presented a video from election night that she and the other lawyers claimed showed irregularities in how ballots were counted in Atlanta in corroboration with affidavits written by election observers.[3]

The video was surveillance footage from State Farm Arena in Fulton County where election workers counted ballots on election night.  Pick and the other lawyers claimed that the video showed that Fulton County election workers announced that ballot counting would stop at 10:30 p.m. and begin again in the morning, as a result of which press representatives and election observers left State Farm Arena.  However, Pick and the other lawyers asserted that election workers resumed counting ballots from around 11:00 p.m. to 1:00 a.m. without providing any notice that the counting would resume to ensure that the process was open to public inspection, as is required by Georgia law.  The surveillance video was 20 hours long, and, in presenting the video during the hearing, Pick at times requested another individual fast-forward or rewind the video to specific moments that she claimed supported her position.

In particular, Pick played sections of the video that she claimed showed when election officials announced that ballot

---

[3]   A   video   recording   of   the   hearing   is   available   at https://www.youtube.com/watch?v=hRCXUNOwOjw.  Pick's presentation begins at 33:30.

counting would stop and when the counting resumed. She pointed out that containers of ballots were pulled out from underneath a table covered by a tablecloth and apparently counted starting at around 11:00 p.m., and she then played a section of the video from earlier in the morning purportedly showing that the woman who had set up that table was the same person who announced that ballot counting would stop for the night. In reference to those ballots, Pick stated, "is it normal to store suitcases of ballots under a tablecloth?" and "I saw four suitcases come out from underneath the table." At another point, Pick pointed out the relevant ballot containers and said, "[s]o, there you have the black -- I'm going to call it a suitcase -- containers for ballots." Additionally, in an answer to a senator's question about the ballot containers, in which he referred to the containers as "suitcases," Pick also called the containers "suitcases." Pick alleged that her description of the ballot containers as "suitcases" was consistent with how many election workers referred to such containers.

Pick also stated that she and the other lawyers received the State Farm Arena video the day before the December 3 hearing, and that she did not have time to view the entire video, but she considered that the relevant portions confirmed affidavits written by election observers discussing the stopping and starting of ballot counting on election night. Further, she asserted that she offered to show the subcommittee other portions of the video, which they declined, and that she "was the only witness to present the Video before the Committee."

In 2021, Simon & Schuster published a book written by Raffensperger titled *Integrity Counts*, which Pick claimed included defamatory statements about her presentation at the December 3 hearing. She specifically pointed to portions of the book that described the State Farm Arena surveillance video as "sliced-and-diced" and that criticized people who referred to official ballot containers as "suitcases." She added that Raffensperger later "changed [the] narratives" that he presented in the book.

Pick quoted certain passages from *Integrity Counts*, including most prominently a section with the heading "Giuliani's Sliced-and-Diced Video," which described the December 3 hearing and the presentation of the State Farm Arena video. In that section, Raffensperger stated that, at the December 3 hearing, "Rudy Giuliani and other lawyers for President Trump presented witnesses and a video that had been deceptively sliced and edited so that it appeared to show the exact opposite of reality." After describing the contents of the video, Raffensperger explained that when election officials announced that ballot counting would stop for the night at 10:30 p.m., he called them and asked them to resume counting. He stated that Giuliani knew this was the case, but Giuliani "showed a slice of video that had removed the clear evidence that Fulton County election workers had protected the ballots and the process as required by law," quoting a statement made by Giuliani at the hearing that the video evidence was "a smoking gun." He concluded that "Giuliani intentionally misled [Georgia] senators" and intentionally spread misinformation with the "chopped-up video."

In another section of the book cited by Pick, Raffensperger quoted an investigative reporter who reviewed the State Farm Arena video and, "[b]elow an image of secure cases to hold ballots," posted the following statement on Twitter: "if you are someone who doesn't even believe the simple, basic fact (that has nothing to do with anything) that these are not suitcases - you live in a world outside of reason & reality. Here they are loading the crates - while observers and media were in the room at 10:01pm." He also quoted a statement made by the Georgia Secretary of State Chief Operating Officer during a press conference, whom Raffensperger described as "exasperated at having to punch down more lies, this time about Giuliani's sliced-up video." The Chief Operating Officer said, "[w]hat you saw, the 'secret suitcases' . . . with magic ballots, were actually ballots that had been packed into those absentee ballot carriers by the workers in plain view of the monitors and the press. The reason they were packed away is because [the workers] were under the misbegotten impression that they were getting to go home."

Raffensperger did not explicitly mention Pick by name in *Integrity Counts*. Nevertheless, Pick asserted that Raffensperger's use of the statements regarding the State Farm Arena video and the term "suitcases" were "of and concerning" her. She explained that she was the only one who presented the video during the December 3 hearing, and an image of her at the hearing "went viral with millions (perhaps tens of millions) of views worldwide, on national network television broadcasts, and in newspapers and online news

outlets." She also stated that multiple acquaintances independently informed her they thought Raffensperger defamed her in the book.

Pick alleged that either (1) Raffensperger viewed the State Farm Arena video and knew that the statements he made in *Integrity Counts* regarding the video were false, or (2) he did not view the video, and his statements showed a reckless disregard for the truth. She added that Raffensperger's statements harmed her reputation. Further, Pick asserted that, although Raffensperger claimed he did not know her and did not intend to harm her reputation, the public knew he was talking about her in *Integrity Counts*, as could be seen from "numerous high profile media outlets and lawsuits repeating Raffensperger's defamatory statements" that used her name. She said that, while Raffensperger specifically targeted Giuliani's statements at the December 3 hearing, she was the only person who presented the video, and she was not affiliated with and did not work with Giuliani.

Raffensperger moved to dismiss Pick's complaint for failure to state a claim. On November 22, 2024, the district court denied Pick's transfer motion and granted Raffensperger's motion to dismiss. As to the transfer motion, the court rejected Pick's argument that the Gainesville Division was the mandatory division venue under the Northern District of Georgia's local rules and declined to transfer the case to that division. It reasoned that Local Rule 3.1(B)(1)(a), which required that "any civil action, not of a local nature, . . . must be brought in the division where the defendant or defendants reside," governed in this case rather than Local Rule

3.1(B)(3) because the latter Rule did not control over the former when "the 'activity' giving rise to the cause of action occurred state-wide." It concluded that Local Rule 3.1(B)(1)(a) dictated that venue was appropriate in the Atlanta Division because Raffensperger lived in that division, and Pick's pleadings did not allege that the "action [wa]s of a nature local to the Gainesville Division."

As to the motion to dismiss, the district court first concluded that Pick failed to state a defamation claim relating to Raffensperger's statements in *Integrity Counts* regarding people who referred to official ballot containers as "suitcases" because those statements were not about her. The court reasoned that Raffensperger's discussion of the term "suitcases" did not target people like Pick, who used the term at the December 3 hearing simply as "field jargon," but rather it was about "those who believe[d] that referenced ballot containers [were] literal suitcases as opposed to legitimate receptacles for ballots," and those who claimed "there were 'secret suitcases' packed, outside of the presence of monitors and the press, with ballots from outside of the normal chain of custody."

Next, the court found that Pick failed to state a defamation claim as to Raffensperger's statements about the State Farm Arena video because those statements were substantially true or hyperbolic. It reasoned that "the underlying gist" of Raffensperger's discussion of the video was that only select portions of the video were played during the December 3 hearing, which was correct, and his reference to the video as "sliced and diced" and "chopped up" was figurative or hyperbolic. It added that Raffensperger did not accuse

anybody of physically altering the video to present something different than what was recorded, but rather he accused those who used the video at the December 3 hearing of failing to show portions of it that made apparent the chain of custody of the purportedly fraudulent ballots.

Lastly, the court dismissed Pick's false light claim, concluding that it failed on the merits for the same reasons that the defamation claim failed. Alternatively, the court concluded that the false light claim was barred by the statute of limitations because Pick filed her complaint more than one year after the alleged injury, and the claim did not relate back to a complaint she initially filed against Raffensperger in Texas.

Pick appeals the November 22 order.

## II. DISCUSSION

Pick raises three arguments. First, she argues that the district court erred by dismissing her defamation claim for failure to state a claim. Second, she argues that the court erred by dismissing her false light claim for failure to state a claim and as barred by the statute of limitations. Lastly, she argues that the district court abused its discretion by refusing to transfer the action to the Gainesville Division. We address each argument in turn.

We note as an initial matter that, when reviewing a dismissal of a complaint, we ordinarily only consider the operative pleading and any exhibits attached to it, and we must accept all of the pleading's allegations as true. *See Baker v. City of Madison, Ala.*, 67 F.4th 1268, 1276 (11th Cir. 2023); *Maglana v. Celebrity Cruises Inc.*, 136

F.4th 1032, 1036-37 (11th Cir. 2025). "If the parties present, and the court considers, evidence outside the pleadings, the motion to dismiss generally must be converted into a motion for summary judgment." *Baker*, 67 F.4th at 1276. An exception to that rule is the incorporation-by-reference doctrine, under which "a court may consider evidence attached to a motion to dismiss without converting the motion into one for summary judgment if (1) the plaintiff refers to certain documents in the complaint, (2) those documents are central to the plaintiff's claim, and (3) the documents' contents are undisputed." *Id.* (quotation marks omitted). Further, we need not accept a complaint's allegations as true when they are contradicted by exhibits. *See Crenshaw v. Lister*, 556 F.3d 1283, 1292 (11th Cir. 2009).

In this case, the district court concluded that in deciding the motion to dismiss it could consider both the transcript of the December 3 hearing and *Integrity Counts* even though both were submitted to the record for the first time by Raffensperger with his motion to dismiss. Pick does not challenge this ruling. Regardless, the district court was correct because (1) Pick referred to both her statements at the December 3 hearing and *Integrity Counts* throughout her complaint; (2) those documents are central to Pick's claims because *Integrity Counts* contains the alleged defamatory statements, and Pick's argument that Raffensperger's statements are false is based on her testimony at the December 3 hearing; and (3) Pick has not challenged the authenticity of the documents. *See Baker*, 67 F.4th at 1276. Therefore, we will consider the December 3 hearing transcript and *Integrity Counts* in reviewing the

November 22 order, and we will not accept as true any allegations in Pick's amended complaint that are contradicted by those documents. *See id.*; *Crenshaw*, 556 F.3d at 1292; *see also Horsley v. Feldt*, 304 F.3d 1125, 1133-35 (11th Cir. 2002) (concluding on review of an order granting judgment on the pleadings in a defamation case that the alleged defamatory article attached to answer could be considered under the incorporation-by-reference doctrine but transcripts, the authenticity of which was contested, could not).

## A. Defamation

Pick's defamation claim is based on two categories of statements made in *Integrity Counts*: (1) statements relating to the use of the term "suitcases" to refer to official ballot containers, and (2) statements relating to the State Farm Arena video that Pick presented during the December 3 hearing.

### 1. "Suitcases"

Pick argues that the district court erred by dismissing her defamation claim relating to the use of the term "suitcases." She contends Raffensperger's derogatory statements about people who used that term in *Integrity Counts* were implicitly about her testimony at the December 3 hearing. Specifically, she asserts that Raffensperger falsely accused her of suggesting during the hearing that ballots cast in the 2020 election had been stored in literal suitcases, while she merely employed the word "suitcases" as a "slang term" that was commonly used by election workers and officials to refer to official ballot containers.

24-14151                Opinion of the Court                13

To establish a claim of defamation under Georgia law,[4] a plaintiff must show "(1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting at least to negligence; and (4) special harm or the actionability of the statement irrespective of special harm." *Oskouei v. Matthews*, 912 S.E.2d 651, 659 (Ga. 2025) (quotation marks omitted). To satisfy the first element, "the allegedly defamatory words must refer to some ascertained or ascertainable person, and that person must be the plaintiff." *Smith v. Stewart*, 660 S.E.2d 822, 828 (Ga. Ct. App. 2008) (quotation marks omitted). "Stated differently, the plaintiff has the burden of showing, inter alia, that the publication was about the plaintiff, that is, whether it was of and concerning her as a matter of identity." *Id.* (quotation marks omitted).

> If the [allegedly defamatory] words used really contain no reflection on any particular individual, no averment or innuendo can make them defamatory.

---

[4] The district court was sitting in diversity, so we apply Georgia state substantive law. *See Admiral Ins. Co. v. Feit Mgmt. Co.*, 321 F.3d 1326, 1328 (11th Cir. 2003). The district court analyzed Pick's claims under Georgia law, but it noted that Pick argued during a hearing that Texas law governed. The court did not decide whether Georgia or Texas law controlled because it concluded that Pick's claims failed on the merits under either state's laws. Pick only analyzes her claims under Georgia law, so she has waived the position that Texas law governs. *See Sun Life Assurance Co. of Can. v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1208 (11th Cir. 2018) ("Under our precedents, a party waives its opportunity to rely on non-forum law where it fails to timely provide—typically in its complaint or the first motion or response when choice-of-law matters—the sources of non-forum law on which it seeks to rely.").

14                    Opinion of the Court                    24-14151

> An innuendo can not make the person certain which was uncertain before. Where the words of the alleged libelous matter are so vague and uncertain that they could not have been intended to refer to any particular person, or the published words are incapable of any other construction other than that they are not defamatory of the plaintiff, the petition is subject to dismissal.

*Fiske v. Stockton*, 320 S.E.2d 590, 592-93 (Ga. Ct. App. 1984) (quotation marks and alterations omitted) (citing *Ledger-Enquirer Co. v. Brown*, 105 S.E.2d 229, 230-31 (Ga. 1958)), *overruled on other grounds by Oskouei*, 912 S.E.2d at 671 & n.26.

Pick's argument is based on the position that, even though her name is not explicitly mentioned in *Integrity Counts*, let alone in connection with the word "suitcases," Raffensperger's statements about people who used that word to refer to official ballot containers implicitly concerned her use of the word at the December 3 hearing. Pick is correct that a plaintiff does not need to be explicitly named in a writing for it to concern her. *See, e.g.*, *Holmes v. Clisby*, 45 S.E. 684, 685-86 (Ga. 1903) (concluding that an advertisement written by the defendant stating that shoes of a specific brand sold by other businesses in the same city were damaged concerned the plaintiff because the plaintiff and defendant owned the only two business that sold the specific brand of shoes in the city). However, it must be sufficiently clear that the statement implicitly refers to the plaintiff. *See, e.g.*, *Cox Enters., Inc. v. Bakin*, 426 S.E.2d 651, 653-54 (Ga. Ct. App. 1992) (holding that articles referring to a patient's death in an emergency room did not concern the defendant, who

was the physician on duty at the time of the patient's death, because they only made "limited reference" to the patient's death "for historical reference" and contained "no reflection on any particular individual with regard to [the patient's] death"); *Horsley*, 304 F.3d at 1136 (holding that an article did not concern the plaintiff because he was not "mentioned either by name or ascertainable implication").

Reading the statements in *Integrity Counts* discussing the use of the term "suitcases" "in the sense in which the readers to whom [the book] is addressed would ordinarily understand it," and considering the statements in the context of the book as a whole, we agree with the district court that those statements do not concern Pick. *See Fiske*, 320 S.E.2d at 593 (quotation marks omitted); *see also id.* (explaining that, if an allegedly defamatory statement's "meaning is so unambiguous as to reasonably bear but one interpretation, it is for the judge to say whether that signification is defamatory or not," but if the statement "is capable of two meanings, one of which would be libelous and actionable and the other not, it is for the jury to say. . . which of the two meanings would be attributed to it by those to whom it is addressed or by whom it may be read" (quotation marks omitted)). The only statements in *Integrity Counts* about people who used the term "suitcases" were about people who claimed that ballots cast in the 2020 election had been stored in literal suitcases. Nowhere in that book did Raffensperger discuss anybody who used the term "suitcases" at the December 3 hearing, nor did he discuss anybody who used the term but did not

dispute that the "suitcases" were official ballot containers rather than literal suitcases.

At the December 3 hearing, Pick only used the term "suitcases" to refer to ballot containers a few times in passing, and one of the times she used it in that way, she made clear that she was referring to ballot containers and not literal suitcases. For that reason, an ordinary reader of *Integrity Counts* would not possibly read the relevant statements to mention Pick "either by name or ascertainable implication." *See Horsley*, 304 F.3d at 1136; *Bakin*, 426 S.E.2d at 653-54. Without any specific mention of Pick or any statements that could potentially be read as alluding to Pick and her use of the term "suitcases" at the December 3 hearing, we cannot conclude that the relevant portions of *Integrity Counts* concerned Pick to support her defamation claim on this ground. Therefore, the district court did not err by dismissing Pick's defamation claim as to the "suitcases" statements.

### 2. State Farm Arena Video

Pick argues that the district court erred by dismissing her defamation claim as to Raffensperger's statements about the State Farm Arena video because Raffensperger falsely accused her of physically altering the video with the intention of deceiving the Senate subcommittee. She asserts that Raffensperger's statements about the video were neither substantially true nor hyperbolic because she did not physically alter the video, but rather she fast-forwarded and rewound to specific sections in the full, unedited video and offered to show the subcommittee other segments.

To state a claim of defamation, Georgia law requires a plaintiff to show that the allegedly defamatory statement is false. *Jaillett v. Ga. Television Co.*, 520 S.E.2d 721, 724 (Ga. Ct. App. 1999). "To this end, defamation law overlooks minor inaccuracies and concentrates upon substantial truth. In other words, a statement is not considered false unless it would have a different effect on the mind of the viewer from that which the pleaded truth would have produced." *Bryant v. Cox Enters., Inc.*, 715 S.E.2d 458, 463 (Ga. Ct. App. 2011) (quotation marks, alteration, and footnotes omitted). "Minor factual errors which do not go to the substance, the gist, the sting of a story do not render a communication false for defamation purposes." *Jaillett*, 520 S.E.2d at 724 (quotation marks and alterations omitted).

Raffensperger's statements about the State Farm Arena video can be broken down into two constituent parts: (1) his statements that the video was "sliced and diced" or "edited," and (2) his statements that the video was shown at the December 3 hearing with the intention of deceiving the Senate subcommittee.

### a. "Sliced-and-Diced"

Raffensperger used multiple similar words and phrases to describe how the State Farm Arena video was presented to the Senate subcommittee during the December 3 hearing: "sliced-and-diced," "sliced," "edited," "chopped-up," and "sliced-up." He also stated that the senators were shown "a slice of video that had removed the clear evidence that Fulton County election workers had protected the ballots and the process as required by law." It is clear

from these different words and phrases, and the context of the relevant portion of the book as a whole, that Raffensperger's ultimate point was that during the December 3 hearing only select portions of the State Farm Arena video were shown to the Senate subcommittee to the exclusion of other portions that did not support the position of those attempting to contest the election results. There is no implication in *Integrity Counts* that anybody involved in presenting the video physically altered it so that it showed events that did not actually occur; rather, the gist of Raffensperger's claim is that only select portions of the video were shown to support the lawyers' narrative of irregularities and potential fraud in ballot-counting procedures.

We agree with the district court that Raffensperger's discussion of the State Farm Arena video is substantially true. Raffensperger is correct that at the December 3 hearing Pick showed only select portions of the 20-hour video that supported her position. As Pick acknowledges, in presenting the video to the Senate subcommittee, she directed that it be fast-forwarded and rewound to specific moments that she contended indicated irregularities in how ballots were being counted. For that reason, the general gist of Raffensperger's statements regarding the video is not false. *See Jaillett*, 520 S.E.2d at 724; *Bryant*, 715 S.E.2d at 463.

At the same time, certain words that Raffensperger used are not completely accurate. Specifically, Raffensperger's use of the words "edited" and "removed" could suggest that he was accusing the lawyers of cutting together the specific segments that were

shown at the hearing into a new video that did not contain any portions of the complete video that contradicted their position. Such an accusation would be inconsistent with Pick's allegation that she played from the complete, unaltered video at the December 3 hearing.

However, this potential inaccuracy is minor and does not undermine the substantial truth of Raffensperger's statements. Even if an ordinary reader of *Integrity Counts* could interpret Raffensperger's statements as accusing the lawyers at the December 3 hearing of literally editing the video, the essential gist of the statements is nevertheless true, *i.e.*, that only select portions of the video that supported the lawyers' position were presented to the Senate subcommittee. *See Jaillett*, 520 S.E.2d at 724; *Bryant*, 715 S.E.2d at 463. That is the unambiguous point that Raffensperger made in *Integrity Counts*, and that point is substantially true, even if the way the point was communicated could imply minor factual errors. The difference between the accusation that the video shown at the December 3 hearing was edited to show select portions of the complete footage and the reality that at the hearing Pick fast-forwarded and rewound the complete footage to select moments is not substantial enough to support Pick's position that Raffensperger's statements regarding the video are false.

Pick also argues that Raffensperger's statements are false because she asked the senators if they wanted to view any portion of the video other than those that she played. However, even if the senators had the opportunity to ask Pick to play specific sections of

the 20-hour video, that does not change the fact that Raffensperger was correct that in reality Pick only showed select portions of the video. *See Lucas v. Cranshaw*, 659 S.E.2d 612, 615-16 (Ga. Ct. App. 2008) (stating that the omission of certain information from a statement does not necessarily render it false for defamation purposes)

### b. Deception

The other aspect of Raffensperger's statements regarding the State Farm Arena video was that the video was shown with the specific intention of deceiving the Senate subcommittee. In *Integrity Counts*, Raffensperger stated that the video "had been *deceptively* sliced and edited so that it appeared to show the exact opposite of reality." Further, he contended that Giuliani, by showing select portions of the video and claiming that it was evidence of fraud and irregularities, "misled [the] senators" and intentionally spread misinformation.

Pick argues that these statements are false because in presenting the State Farm Arena video she did not intend to deceive the Senate subcommittee. In her complaint, Pick alleged that she obtained the video only the day before the December 3 hearing, so she did not have the opportunity to view it in its entirety before presenting it. Pick further alleged that she and others determined that the portions of the video corroborated affidavits of election observers that irregularities had occurred in ballot-counting procedures. Based on these allegations, Pick plausibly alleged that she presented the State Farm Arena video at the December 3 hearing based on a good-faith belief in her position rather than with the

intention of deceiving the Senate subcommittee. Nevertheless, even accepting her allegations as true, we conclude that Pick failed to adequately allege that Raffensperger's statements on this ground were false for defamation purposes.

Under Georgia law, "a defamation action will lie only for a statement of fact. This is because a statement that reflects an opinion or subjective assessment, as to which reasonable minds could differ, cannot be proved false." *Cottrell v. Smith*, 788 S.E.2d 772, 781 (Ga. 2016) (quotation marks omitted). For that reason, as a general matter, "statements of pure opinion . . . cannot form the basis of a defamation claim." *Bryant*, 715 S.E.2d at 463. However, "[a]n opinion can constitute actionable defamation if the opinion can reasonably be interpreted, according to the context of the entire writing in which the opinion appears, to state or imply defamatory facts about the plaintiff that are capable of being proved false." *Cottrell*, 788 S.E.2d at 781 (quotation marks omitted).

Raffensperger's statements that the lawyers at the December 3 hearing intentionally deceived the Senate subcommittee is a statement of opinion that cannot form the basis of a defamation claim. *See id.*; *Bryant*, 715 S.E.2d at 463. It is true that Raffensperger's statements of opinion regarding the lawyers' deceptive intentions are based on a statement of fact—that the lawyers showed only select portions of the State Farm Arena video to support their challenge to the election results—but that does not render the opinion actionable because that statement of fact is substantially true, as is discussed above. *See Cottrell*, 788 S.E.2d at 781.

Georgia courts have held that a statement of opinion, including a statement about another's motive in taking a certain action, is not defamatory when the opinion is based on statements of facts that are true. *See, e.g.*, *Collins v. Cox Enters., Inc.*, 452 S.E.2d 226, 227 (Ga. Ct. App. 1994) (concluding that a plaintiff's statement that the defendant "hoped to fool voters by running for public office" under a name similar to the current governor's was not "an assertion of objective fact that might be proved false" because the defendant's "conjecture regarding [the plaintiff's] motive cannot be proven as absolutely true or false"); *Jaillett*, 520 S.E.2d at 726 (holding that a statement that the plaintiff "ripped off" a customer that was based on a true statement of fact without the implication of any additional facts was a nondefamatory statement of opinion); *Austin v. PMG Acquisition, LLC*, 629 S.E.2d 417, 420 (Ga. Ct. App. 2006) (holding that a defendant's "opinion based upon her interpretation of the facts" was not defamatory). In contrast, Georgia courts have held that statements of opinion can be defamatory when they are based on statements of fact that could be proven false. *See Equity Prime Mortg., LLC v. Greene for Cong., Inc.*, 908 S.E.2d 717, 722-23 (Ga. Ct. App. 2024) ("[N]ot all of [the defendant's] statements were mere opinion or hyperbole; instead, some of those statements may be reasonably understood to imply defamatory facts about [the plaintiff] that could be proven false, and the trial court erred in concluding that [the plaintiff] could not demonstrate the falsity necessary to support a defamation claim."); *N. Atlanta Golf Operations, LLC v. Ward*, 870 S.E.2d 814, 818-19 (Ga. Ct. App. 2022) ("Where . . . a defendant offers specific statements capable of being proved

false in explanation for a negative opinion about a plaintiff's professional abilities, that statement can be the ground for a defamation claim. . . . The explanation must have been *truthful* to avoid potential liability for defamation." (quotation marks, omission, and alteration omitted)).

> The Georgia Court of Appeals has stated,

> If an opinion is based upon facts already disclosed in the communication, the expression of the opinion implies nothing other than the speaker's subjective interpretation of the facts. . . . If the defendant bases his expression of a derogatory opinion of the plaintiff on his own statement of facts that are not defamatory, he is not subject to liability for the factual statement— nor for the expression of opinion, so long as it does not reasonably indicate an assertion of the existence of other, defamatory, facts that would justify the forming of the opinion.

*Jaillett*, 520 S.E.2d at 726 (quotation marks omitted).

Based on this law, we conclude that Raffensperger's statement that the lawyers at the December 3 hearing intended to deceive the Senate subcommittee was a statement of opinion based on disclosed statements of fact that were substantially true. Raffensperger's statements regarding the lawyers' intentions were simply an interpretation of nondefamatory, substantially true facts. Therefore, Raffensperger's statements regarding the lawyers' deceptive intentions in *Integrity Counts* are not defamatory.

Pick also argues that Raffensperger's statements regarding the lawyers' deceptive intentions were defamatory because they constituted an accusation of a crime: making a false statement to a governmental body, in violation of O.C.G.A. § 16-10-20. However, for a statement of opinion that allegedly implies criminal activity to be defamatory,

> the words at issue must charge the commission of a specific crime punishable by law. Where the plain import of the words spoken impute no criminal offense, they cannot have their meaning enlarged by innuendo. Indeed, the statement must give the impression that the crime is actually being charged against the individual and couched in language as might reasonably be expected to convey such meaning to a hearer of the statement; a vague statement or even a derogatory one does not amount to [defamation] when a person cannot reasonably conclude from what is said that the comments are imputing a crime to the plaintiff.

*Swanson Towing & Recovery, LLC v. Wrecker 1, Inc.*, 802 S.E.2d 300, 305 (Ga. Ct. App. 2017) (quotation marks omitted) (citing *Cottrell*, 788 S.E.2d at 781); *see also Rosser v. Clyatt*, 821 S.E.2d 140, 148 (Ga. Ct. App. 2018) (explaining that statements of opinion that an average reader would not construe to be legal conclusions that the plaintiff committed a crime are not defamatory).

Raffensperger's statements in *Integrity Counts* about the December 3 hearing do not "give the impression that [a] crime is actually being charged against" Pick and the other lawyers, so they

are not defamatory as accusations of criminality. *See Swanson Towing*, 802 S.E.2d at 305; *Rosser*, 821 S.E.2d at 148.

In sum, Raffensperger's statements that the State Farm Arena video shown at the December 3 hearing was "sliced and diced" were substantially true, and his statements that the lawyers showed that video with the intention of deceiving the Senate subcommittee were statements of opinion. Therefore, Pick has failed to state a claim of defamation based on these statements, and so the district court did not err in granting Raffensperger's motion to dismiss on this ground.

## B. False Light

Next, Pick argues that the district court erred by dismissing her false light claim on the same grounds as her defamation claim because its analysis of the latter claim was erroneous. She also argues that the district court erred by concluding that her false light claim is barred by the statute of limitations.

Under Georgia law, "to establish a claim of false light, a plaintiff must establish the existence of false publicity that depicts the plaintiff as something or someone which she is not." *Ass'n Servs., Inc. v. Smith*, 549 S.E.2d 454, 459 (Ga. Ct. App. 2001) (quotation marks and alteration omitted). To satisfy this requirement, a plaintiff must show that (1) the relevant publication is false, and (2) the publication depicts the plaintiff. *See Zarach v. Atlanta Claims Ass'n*, 500 S.E.2d 1, 6 (Ga. Ct. App. 1998) (discussing the falsity element); *Merz v. Pro. Health Control of Augusta, Inc.*, 332 S.E.2d 333, 335-36 (Ga. Ct. App. 1985) (concluding that the plaintiffs' false light

claim failed because the alleged false publication did not contain any likenesses or references to the plaintiffs).  In other words, "[i]n order to sustain a false light invasion of privacy claim, a plaintiff must show that the defendant knowingly or recklessly published falsehoods about him or her and, as a result, placed him or her in a false light which would be highly offensive to a reasonable person." *Smith*, 660 S.E.2d at 834.

Pick's defamation claim failed because she did not adequately allege that Raffensperger's statements in *Integrity Counts* were false or concerned her.  Therefore, she has also failed to allege that *Integrity Counts* was a "false publication" that depicted her "as something or someone which she is not."  *See Ass'n Servs.*, 549 S.E.2d at 459 (quotation marks and alteration omitted); *Zarach*, 500 S.E.2d at 6; *Merz*, 332 S.E.2d at 335-36; *Smith*, 660 S.E.2d at 834.

For that reason, we conclude, without addressing the statute-of-limitations issue, that the district court did not err by dismissing Pick's false light claim.[5]

## C.  Transfer

Lastly, Pick argues that the district court abused its discretion by denying her motion to transfer the action from the Atlanta Division to the Gainesville Division.  Specifically, she argues that

---

[5] Even if there is a distinction between defamation and false light law such that a plaintiff may be able to state a false light claim based on certain statements even though her defamation claim based on the same statements fails, Pick has not argued that such a distinction exists or that the district court failed to make such a distinction.

24-14151                Opinion of the Court                27

the district court's interpretation of its local rules regarding division venue is erroneous.

Northern District of Georgia Local Rule 3.1(B)(1)(a) states, "[e]xcept as otherwise provided, any civil action, not of a local nature, against a defendant or defendants, all of whom reside in [the Northern District of Georgia], must be brought in the division where the defendant or defendants reside." N.D. Ga. L.R. 3.1(B)(1)(a). A different subsection within the same provision states, "[a]ny civil action brought in [the Northern District of Georgia] on the grounds that the cause of action arose [t]here must be filed in a division of the district wherein the activity occurred." *Id.* L.R. 3.1(B)(3). Pick asserts that the district court erred by concluding that Rule 3.1(B)(3) does not control over Rule 3.1(B)(1)(a) when the activity giving rise to the cause of action occurred state-wide.[6]

---

[6] We note that 28 U.S.C. § 1404(a) permits a district court to transfer a case to a different division "[f]or the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a); *Manuel v. Convergys Corp.*, 430 F.3d 1132, 1135 n.1 (11th Cir. 2005) (listing the discretionary factors that a district court should consider when deciding whether to transfer a case under § 1404). While this statute is the primary authority for transferring a case to a different division, Pick did not discuss it in her transfer motion, she stated in a filing that her motion did not concern that provision, and the district court did not address it in its order denying the motion. Further, Pick does not argue that the district court should have considered her transfer motion under § 1404(a) or that it misapplied the relevant factors in denying her motion. Instead, she focuses on the district court's interpretation of the local rules. Therefore, we do not address the applicability of § 1404(a).

"We give great deference to a district court's interpretation of its local rules and review a district court's application of local rules for an abuse of discretion." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1302 (11th Cir. 2009) (quotation marks omitted); *see also Clark v. Hous. Auth. of City of Alma*, 971 F.2d 723, 727 (11th Cir. 1992) ("[T]his circuit gives great deference to a district court's interpretation of its local rules."). "In order to meet the abuse of discretion standard, Plaintiffs bear the burden of showing that the district court made a clear error of judgment." *Mann*, 588 F.3d at 1302.

We conclude that the district court's interpretation of its local rules was not an abuse of discretion in light of the great deference we must afford to it. *See id.*; *Clark*, 971 F.2d at 727. The language of the relevant local rules supports the district court's conclusion that Rule 3.1(B)(3) does not control over Rule 3.1(B)(1)(a) when the activity giving rise to the cause of action occurred statewide. Specifically, the language "must be filed in *a* division of the district wherein the activity occurred" suggests that, in a case like this one, where the complaint does not allege any exclusive connection to a specific division, the action does not need to be heard in one particular division over another. *See* N.D. Ga. L.R. 3.1(B)(3) (emphasis added). For that reason, it was reasonable for the district court to conclude that Rule 3.1(B)(3) did not require the suit to be heard in the Gainesville Division over the Atlanta Division, and that the Atlanta Division was an appropriate venue under Rule 3.1(B)(1)(a) given that Raffensperger lives in the Atlanta Division.

Even if we agreed with Pick that her interpretation of the local rules is preferable to the district court's interpretation, we do not consider the district court's interpretation to be so unreasonable as to be a clear error of judgment. *See Mann*, 588 F.3d at 1302. Therefore, Pick has failed to meet her burden in showing that the district court abused its discretion by denying her transfer motion.

Pick also argues that the district court abused its discretion by denying her transfer motion because she originally filed the suit in the Gainesville Division, but it was transferred to the Atlanta Division by a clerk *sua sponte* without her consent. She asserts that this action did not comport with due process because she was not afforded the opportunity to challenge the initial transfer, and the district court should not have placed the burden on her to show why the case should be transferred back to the Gainesville Division when that was her first choice of venue.

This argument is premised on the contention that Pick did in fact initially file this case in the Gainesville Division, but her contention is not supported by the record. The available information indicates that, whatever her intentions were, Pick initially filed this case in the Atlanta Division.

The one fact that supports Pick's contention that she initially filed this case in the Gainesville Division is that the heading of her initial complaint states, "In the United States District Court for the Northern District of Georgia, Gainesville Division." However, that heading does not necessarily mean the case was filed in the

Gainesville Division, and all other evidence points to the conclusion that the case was filed in the Atlanta Division.

First, the case number listed on the initial complaint, "1:24-cv-1607-AT," which is the same number listed on the docket and all of the filings, indicates that the case was initially filed in the Atlanta Division. That the case number begins with a one reflects that the case was filed in the Atlanta Division, and the first number would be a two if the case was filed in the Gainesville Division. *See* N.D. Ga. L.R. 5.1(K) ("A civil case filed in this Court shall be assigned a case number which will identify it as a civil case, *designate the division*, the year and the numerical sequence in which the case was filed, and include a three-initial suffix which will identify the district judge to whom the case is assigned." (emphasis added)); *compare* N.D. Ga. Case No. 1:25-cv-1 (case filed in the Atlanta Division), *with* N.D. Ga. Case No. 2:25-cv-1 (case filed in the Gainesville Division). Additionally, there are no docket entries indicating that the case was ever in the Gainesville Division or that it was transferred from that division to the Atlanta Division. A search of the Northern District of Georgia's filing system also does not reveal any case initiated by Pick in the Gainesville Division that was subsequently transferred to the Atlanta Division; in fact, the docket for the underlying case is the only one that comes up when Pick's name is entered into the system.

The only record citation that Pick offers in support of her contention that she initially filed this case in the Gainesville Division and then transferred it to the Atlanta Division is to an April 24,

2024, order, but that order does not support her contention. In that order, Judge Amy Totenberg, who was initially assigned to the case, as can be seen from the initials at the end of the civil case number listed in Pick's initial complaint, declined assignment of the case based on her status as a senior judge. Judge Totenberg sits in the Atlanta Division of the Northern District of Georgia, as is indicated in the heading of the April 24 order. Therefore, rather than showing that the case was initially filed in the Gainesville Division and then transferred to the Atlanta Division, the April 24 order instead supports the conclusion that the case was in fact initially filed in the Atlanta Division and was never assigned to the Gainesville Division.

Based on all of these facts, we conclude that this case was initially filed in the Atlanta Division and was never transferred from the Gainesville Division. Therefore, we reject Pick's arguments that she was deprived of due process or that the district court placed an improper burden on her in denying her transfer motion.

Accordingly, the district court did not abuse its discretion by denying Pick's motion to transfer the case to the Gainesville Division.

### III. CONCLUSION

The district court did not err by dismissing Pick's defamation and false light claims. The court also did not abuse its discretion by denying Pick's motion to transfer the case to the Gainesville Division. Accordingly, we affirm the district court.

**AFFIRMED.**